Argued September 17, reversed October 23, 1925.

## ELERATH STEEL & IRON COMPANY *v.* WM. CORNFOOT ET AL.

(240 Pac. 229.)

**Trover and Conversion—Whether Plaintiff Owned Lumber and was Entitled to Possession Held for Jury.**

1. In action for conversion of lumber, where defendant asserted lumber in question belonged to real estate company, and claimed lumber as lessee of real estate company only, evidence *held* sufficient to take case to jury on whether or not plaintiff owned lumber and was entitled to possession thereof; testimony tending to show plaintiff had right to lumber under agreement to dismantle buildings and that real estate company did not claim or own such lumber.

Property—Lumber from Dismantled Structures Personal Property.

2. Where structures on premises are rightfully dismantled, wrecked lumber is personal property.

Trover and Conversion—Same Evidence Suffices to Establish Title or Right to Possession as in Other Actions.

3. The same character of evidence which will suffice to establish title or possession, or right to possession of chattels in other actions, may prove the same in action of trover.

Evidence—Witness may Testify Directly in First Instance as to Who Owned Property Converted.

4. A witness in a conversion suit may testify directly, in first instance, as to who owned property in question, if he could do so positively and not as matter of opinion.

Trover and Conversion—Absolute Title Need not be Shown.

5. In action for conversion, absolute title in plaintiff need not be shown; the mere fact of lawful possession in plaintiff and wrongful taking by defendant being sufficient.

Judgment—Record of Suit, Settling Rights as to Removal of Buildings from Property Admissible in Suit for Conversion of Dismantled Lumber.

6. In action for conversion of lumber from dismantled structure, which defendant claimed belonged to real estate company, record of an injunction suit settling rights between plaintiff and real estate company to removal of buildings and ways from property in question was properly admitted.

From Multnomah: Robert Tucker, Judge.

Department 1.

This is an action of damages for the conversion of certain personal property which is described as lumber in an exhibit attached to the complaint. The cause was tried to the court and a jury. At the close of all the testimony the court directed the jury to find a verdict for the defendant. From a judgment entered accordingly, the plaintiff appeals.

2. See 22 R. C. L. 72.

4. Opinion of witness as to ownership of property, see note in Ann. Cas. 1912C, 666.

5. Title on which trover maintainable, see note in 1 Am. Dec. 585. See, also, 26 R. C. L. 1131.

The substance of the allegations of plaintiff's complaint are as follows: The plaintiff is an Oregon corporation, but A. F. Elerath is the owner of the stock of the corporation and referred to in the record of the testimony and in the briefs as being the plaintiff. The defendants, William Cornfoot and Robert McIntosh, were partners doing business under the name and style of Cornfoot & McIntosh. In December, 1919, at the City of Portland, county of Multnomah, State of Oregon, and during the times mentioned in the complaint, the plaintiff was the owner in possession and entitled to the possession of certain goods and chattels, viz., lumber, described in an exhibit to the complaint, then and there being of the reasonable value of $5,774.44, which defendants wrongfully took and converted to their own use to plaintiff's damage in said sum for which it demands judgment.

Defendants answered denying the gist of the complaint and for a separate answer allege affirmatively, in effect, that the Montgomery Estate Company, a corporation, at all the times mentioned in the complaint, was and is the owner of all of the personal property located in and about the Albina shipyards mentioned in the complaint. The answer then proceeds thus:

"That said property is located on what the plaintiff designates in its amended complaint as the Albina shipyards. That the so-called Albina shipyards embrace river lots 10, 11, 12, 13, 14 and 15; all of blocks 80, 81, 82, lots 1, 2, 7 and 8 of Block 83, and lots 5, 6, 7 and 8 in block 70 original townsite of Albina, including the streets along said lots and blocks (the streets having been vacated temporarily for the use of a shipbuilding site)."

The defendants aver that Albina shipyards where the personal property described in the complaint was located, consisting of the lots and blocks mentioned above but not the streets, together with the personal property thereon, was owned by the Montgomery Estate Company, and that the company then leased a portion of the lots, together with the personal property, to defendants, who went into possession of the real property under the lease; that defendants had no interest in "said property" or any part thereof, except as tenants under said lease.

The reply contains a denial of the substance of the new matter, and sets forth the history of the transaction between the different parties, sounding like evidence.                                    REVERSED.

For appellant there was a brief and oral arguments by *Mr. T. R. Hamer* and *Mr. G. E. Hamaker.*

For respondents there was a brief over the name of *Mr. Sanderson Reed,* with an oral argument by *Mr. J. F. Boothe.*

BEAN, J.—The facts in the case are somewhat complicated. We take the following matter from the statement in the brief of defendants. Originally William Cornfoot, one of the defendants doing business under the name of Albina Engine & Machine Works, entered into a lease with the Montgomery Estate Company, for a term of three years, from November 10, 1916, to November 10, 1919, consisting of the real property, first above described, not mentioning the streets. Cornfoot constructed several buildings and ways on this property extending over and covering some of the streets which he

operated as a shipbuilding plant until a month or so before the expiration of this lease. He had the right to remove any or all of the buildings or structures before the expiration of the lease.

After the reference to the allegations of plaintiff's reply, the defendants' brief states:

"The plaintiff agreed with Barde to wreck any and all buildings designated by Barde which were to be wrecked. The ships ways lying on and imbedded in the ground could not be wrecked. They were not buildings and were not mentioned at all in the agreement with Barde, Exhibit 'A.' The testimony shows that Barde did not designate any buildings to be wrecked."

It will be seen from the statement of the pleadings that the issue in the case was whether the plaintiff was the owner of the lumber in question or not. The claim of defendants was, that the Montgomery Estate Company was the owner of the wrecked lumber, not the plaintiff, and that defendant only claimed the same as a lessee of the estate company. The plaintiff assigns error in directing a verdict for defendants. It is agreed that the Albina Engine and Sales Company is the same as J. N. Barde.

The testimony in the case is clouded by numerous objections and colloquies, and arguments of counsel. Plaintiff's counsel by their interrogatories strenuously endeavored to confine A. F. Elerath, whom we call plaintiff, to the language of the complaint, or largely to legal conclusions. It, however, appears from the testimony, when extracted from the mass, that on September 23, 1919, Elerath's company entered into a contract with one J. N. Barde, of the Albina Engine and Machine Sales Company, whereby Elerath was to wreck any and all buildings designated

by Barde on the property formerly occupied by the Albina Engine and Machine Works; Elerath's company assuming all costs of labor, machinery and material necessary to wreck the buildings, and to pay on weekly settlements, $1.50 per load for wood, and $2 per thousand, for lumber taken from any buildings to be wrecked, and $8 for lumber piled in yards, or other commercial lumber designated for sale, stipulating what should be merchantable lumber. Barde "agrees to allow the party of the first part to sell said lumber and wood from the yard formerly occupied by the Albina Engine & Machine Works, Inc., of Portland, Oregon."

Elerath was to make a deposit of $500 with Barde as security for carrying out the agreement. The contract contains the further provision:

"It is further agreed that the party of the first part (Elerath )is entitled to such iron and windows as may come out of any and all *buildings* and *ways* that may be designated by the party of the second part of the agreement to be wrecked or dismantled. These windows and iron that are part of the structure itself." (We italicize.)

Barde, by the contract, reserved such merchantable lumber as might be desired for his own use.

It appears the contract was written by the parties themselves without the aid of an attorney and the provisions thereof are not entirely clear. We think it is apparent therefrom that Elerath was to dismantle the buildings and ways designated by Barde upon the Albina shipyards, and the wood and lumber derived therefrom he was entitled to sell and dispose of. We fail to see that the settlement to be made between Elerath and Bard enters into the case. Barde did not reserve title to the lumber until he should make a settlement with plaintiff.

We note here that defendants contend that the ship-ways were not included in the contract. The paragraph of the contract, last quoted, which is in the latter part of the contract, indicates otherwise.

There is a sharp conflict in most of the testimony. That of A. F. Elerath, as a witness of plaintiff, tended to show, in effect, that on the next day, after making the contract with Barde, the plaintiff proceeded to dismantle some of the buildings and shipways designated by Barde on the property, which for brevity's sake we will call the "shipyards," and finished the work in March, 1920. He sold some of the wreckage therefrom as wood and considerable of it as lumber. Quite a large amount of the latter was sold to the defendants. This amount so sold is not involved in this action. The defendants at one time made plaintiff an offer for the lumber in controversy, which was refused as being too low.

About the time the lease given by the Montgomery Estate Company expired, namely, on November 10, 1919, that company objected to the dismantling, or removing, of any of the buildings on its lots and blocks and procured an injunction against plaintiff preventing such removal.

For a time all the work of the plaintiff was held in abeyance. Then a representative of the Montgomery Estate Co., who is one of the attorneys for defendants in this action, ordered plaintiff to remove no buildings or structures on the lots and blocks of said company, but informed plaintiff, in effect, that the Estate Company did not claim the buildings or structures situated upon the streets adjacent to the said lots and blocks and that the plaintiff could take anything that was in the streets. After

that plaintiff continued to wreck the parts of several structures located upon the streets. Plaintiff and its foreman, one B. N. Albright, measured the lumber, which plaintiff had dismantled, and taken possession of under the contract with Barde, and introduced lists thereof, which were verified, by the testimony showing that he had upon the shipyard 189,815 board feet of the alleged value of $3,796.30 and 20,603 board feet of the alleged value, at $20 per thousand, of $412.06. That this lumber was of the reasonable market value of $5,774.44.

That defendants were at the time engaged in constructing a drydock in the vicinity of the shipyards for the City of Portland; and in March, April and May, 1920, took all of the lumber described in such lists, and which was there on the yards, and used it in connection with the construction of the drydock without the consent of the plaintiff.

Elerath, in explanation of his understanding of the injunction, testified thus:

"A. I was only injuncted from taking out the material that belonged to the Montgomery Estate; that is what the injunction was for.

"The Court.—He refers to time."

This witness also testified as follows:

"Q. Then why did you say those buildings were wrecked by the tenth of November? Why did you fix the tenth of November as the time for the completing of the wrecking of the buildings?

"A. The wrecking that I had done was completed November tenth until after we had seen you (addressing Mr. Boothe who represented the Montgomery Estate Co.) and you told us to go back and take all the lumber we wanted away from there except what was in the buildings, not disturb the

buildings, and that is how I come to know November 10th.

"* * I told you you could finish up everything you had on the ground there under Barde's contract?

"A. Everything on the ways and clean up the streets. That is what you wanted done, for your own benefit."

That the lumber in the controversy, after the injunction was served, was on the old shipyard consisting of lots and blocks and streets. Elerath further testified, to the effect, that a large part of the lumber after it was wrecked was piled upon a certain street; that it was desired to clean the street in order to grade it, and at the instance of one of the defendants he moved the lumber on to the lots, belonging to the Estate Company, adjoining the streets.

In another place in his testimony, he states that the lumber was taken down from the buildings designated by Barde before the injunction. (It may be that he here refers to a part of the lumber.) He said that Mr. Booth told him as follows: "After the injunction was served I went to see him and he told me all they wanted cleaned up was the streets and the ways and the buildings that ran across the street, to cut them off but leave the buildings on the lots." That the lumber in suit was a part of the lumber that Mr. Boothe told him after the injunction to haul away.

B. N. Albright, plaintiff's foreman of the wrecking crew, testified as a witness for plaintiff, giving details as to the situation of the several buildings and ways on the shipyard, and to the effect that the buildings that plaintiff wrecked were parts of the buildings that were in the streets, "with the excep-

tion of one which we started to take the windows out of and I was informed of the fact that there was an injunction out against wrecking that and I stopped; there was no other building wrecked, I believe, but what was in the street''; that he measured and tallied the lumber with the plaintiff. That there were five "ways"; that they ran across two streets and clear to the river.

The foreman of the defendants, in the construction of the dry-dock, testified for defendants that they took none of the lumber mentioned, except "trash." What was "lumber" and what was "trash," we do not find explained.

1. We will not stop to digest the testimony on behalf of the defendant. It is sufficient to say that the testimony on behalf of the plaintiff, we think, was sufficient to take the case to the jury. We are not permitted to pass upon the weight of the testimony. The testimony tended to show, and it is practically conceded, that plaintiff had a right to the lumber dismantled prior to November 10, 1919, and also what was taken from the streets after that time. It is indicated that the Montgomery Estate did not claim or own such lumber and the defendants, by their answer, claim only as lessees of the estate company.

The main question in the case was whether plaintiff owned the lumber and was entitled to the possession thereof or not. If not, then the Montgomery Estate Company was the owner. Or, stated more broadly was the lumber a part of that dismantled prior to November 10, 1919, and from the parts of the structures in the streets after that date, or was it taken from the lots and blocks of the estate com-

pany thereafter; and did the defendant wrongfully take it and use it?

2, 3. Whatever may be said about the structures, on the premises described, there can be no question but that after they were rightfully dismantled the "wrecked" lumber was personal property. The same character of evidence which will suffice to an established title or possession, or right to possession of chattels, in other actions may prove the same in an action of trover: Bowers on Law of Conversion, § 615 et seq.

We read in 38 Cyc., page 2081 (p. viii):

"Title and Right to Possession.—(a) Of Plaintiff. Evidence, oral or written, which tends in any degree to prove or to disprove plaintiff's title or possession is admissible even though it be statements made by plaintiff himself, a lease, or record of an action, to which defendant was not a party, or a sale to defraud creditors, defendant not being one of them.

"(b) Of Defendant. The right of defendant to the admission of evidence in support of title or right of possession in himself is as broad as that of plaintiff, and is, on the other hand, similarly subject to the same limitations as to its admissibility and as to its weight and sufficiency." Citing among other authorities, *Goltra* v. *Penland,* 42 Or. 18 (69 Pac. 925).

4, 5. The plaintiff testified, in effect, that he was the owner of the property. In an action for conversion a witness may testify directly, in the first instance, who owned the property, if he could do so positively, not as mere opinion. Absolute title need not be shown. The mere facts of lawful possession in plaintiff and wrongful taking by defendant are sufficient. Abbott's Trial Evidence, p. 623, §§ 3, 4.

6. It was appropriate to admit in evidence the record in the suit for an injunction of *Montgomery Estate Co.* v. *Elerath Steel & Iron Co. et al.,* over the objection of plaintiff. The record had a bearing upon the issues. As we understand, it pertains to the structures on the premises of the Estate Company as they existed after the lease mentioned expired. That suit settled and adjudicated the right of those parties as to the removal of any buildings or ways therefrom after November 10, 1919.

We find no other assignments of error that it is essential to notice.

The judgment of the Circuit Court must be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

McBRIDE, C. J., and BURNETT and RAND, JJ., concur.