Argued December 21, 1943; affirmed February 1, 1944

## COMMERCIAL FINANCE CORPORATION
### *v.* BURKE ET AL.

(145 P. (2d) 473)

Before BAILEY, Chief Justice, and BELT, KELLY, LUSK and HAY, Associate Justices.

*Henry E. Perkins,* of Klamath Falls, for appellants.

*O. J. Frohnmayer,* of Medford (Neff & Frohnmayer, of Medford, on the brief) for respondent.

BAILEY, C. J. This suit was instituted by Commercial Finance Corporation to foreclose a chattel mortgage on a 1940 Chevrolet automobile owned by Frederick G. Markwardt and T. R. Markwardt, co-partners doing business as Chiloquin Garage & Auto Company, who will hereinafter be referred to as the defendants. A. L. Mallory, who had the automobile in his possession at the time the suit was instituted, was made a party defendant and filed a joint answer with the Markwardts. W. J. Burke also was named as a defendant but was not served and made no appearance.

The facts in the case are not in dispute. In May, 1941, and for some years prior thereto, the defendants conducted a garage business at Chiloquin, Oregon, and in connection therewith sold new and used automobiles. W. J. Burke was a salesman for the defendants and had been in their employ for about eighteen months at the time the chattel mortgage in suit was executed. He had authority to take out new and used cars for demonstration purposes, to take delivery of used cars in part payment of the purchase price of other cars, and to receive from the owners thereof the respective certificates of title, which certificates he was required to "turn into

the office" of the defendants. Sales and exchanges made by him were subject to approval by the defendants.

Early in May, 1941, Mrs. Lily Mae Simms, who lived approximately forty-two miles from Chiloquin, purchased from the defendants through Burke a new automobile and in part payment therefor turned in a 1940 Chevrolet sedan, the automobile first above mentioned. At the time of delivering that car to Burke, Mrs. Simms handed to him the certificate of title thereto, signed by her and left blank as to the name of the transferree. The new car that Mrs. Simms purchased was not delivered to her until about two weeks after she turned her Chevrolet over to Burke.

On or about May 6, 1941, Burke informed the defendants that he had a prospective buyer for the 1940 Chevrolet sedan, and took out that car. He then drove it to Klamath Falls and applied to the plaintiff for a loan, to be secured by a chattel mortgage on the automobile. He exhibited to the plaintiff the certificate of title delivered to him by Mrs. Simms, wherein he had placed his name as transferree. After examining the certificate of title and inspecting the car the plaintiff loaned to Burke $488.50, and he thereupon executed in favor of the plaintiff a chattel mortgage on the 1940 Chevrolet sedan, which chattel mortgage was filed on the same day in the office of the county clerk of Klamath county. The plaintiff also forwarded to the secretary of state the certificate of title with the amount of its lien thereon shown. On May 8, 1941, the secretary of state issued and mailed to the plaintiff a new certificate of title, in which W. J. Burke was designated as owner and the plaintiff as mortgagee.

The loan made by the plaintiff to Burke was payable in thirty days. On or about June 27, 1941, Burke paid approximately $37 on the loan and signed a new note for $554.94, payable in eighteen monthly installments. The first mortgage given by Burke was then canceled and a new one was executed by him, which is the chattel mortgage sought to be foreclosed in this suit.

The defendants undertook to sell the 1940 Chevrolet sedan to A. L. Mallory, on or about July 20, 1941. The certificate of title surrendered by Mrs. Simms could not be found, and the defendants applied to the secretary of state for a duplicate of that certificate. They were informed by that official that the records in his office showed that title to the vehicle in question stood in the name of W. J. Burke and that Commercial Finance Corporation was the "legal owner" of the Chevrolet. The defendants thereupon contacted Mrs. Simms and learned from her that she had delivered the certificate of title to Burke along with the 1940 Chevrolet formerly owned by her.

The defendants, as testified by one of them, had asked Burke a number of times for the certificate of title to the 1940 Chevrolet, and each time "he made excuses that he hadn't received it yet".

About July 22, 1941, Burke was arrested at Klamath Falls for drunken driving. He was released on bail the following morning. Shortly thereafter he left Klamath Falls and his location has not since been known. On learning of his arrest the plaintiff began to make an investigation as to the location of the Chevrolet mortgaged to it by Burke, and discovered that the defendants owned it.

The trial court found in favor of the plaintiff and entered a decree foreclosing the chattel mortgage. The defendants Markwardt have appealed.

■ The question for determination in this case is: Whose right is superior, that of the defendants because of their ownership of the automobile, or that of the plaintiff because of its mortgage? The plaintiff contends that although both it and the defendants Markwardt were innocent of the wrong perpetrated by Burke, the defendants must suffer the loss brought about by the wrong of Burke because they put it in his power to commit the wrong. In support of its contention the plaintiff relies upon the well-established equitable principle that when one of two innocent persons must suffer because of the acts of a third, he who by his conduct, act or omission has enabled the third person to occasion the loss must sustain it: 31 C. J. S., Estoppel, § 103, page 325.

The defendants do not question the correctness of the foregoing rule, but assert that the rule has no application in cases in which the wrong was accomplished though a criminal act: 31 C. J. S., Estoppel, § 103 at page 330. They argue that in retaining the certificate of title, inserting his name therein as assignee, procuring the loan and mortgaging the automobile, Burke committed a crime.

■ The owner of a motor vehicle in Oregon before being entitled to operate it on the highways of the state is required to procure from the secretary of state an official certificate of title of such motor vehicle. The certificate is *prima facie* evidence "of the ownership of such motor vehicle, or of an interest therein": § 115-114, O. C. L. A.

■ In case of the sale of a motor vehicle for which a certificate of title has been issued, the owner is required to endorse on the back of the certificate an assignment thereof, "and the purchaser shall sign said certificate in the space" therein provided. The holder of such certificate, except as hereinafter noted, is required within ten days after the sale to present the certificate of title to the secretary of state, in order that a new certificate may be issued. In the event, however, that the purchaser is a licensed dealer, the name of the purchaser is not required to be inserted until the car has been resold by the dealer, although the dealer must immediately notify the secretary of state that the motor vehicle has been transferred to him: § 115-116, O. C. L. A.

When Mrs. Simms delivered her 1940 Chevrolet to the defendants in part payment for the new car which she was purchasing, the procedure prescribed by statute and undoubtedly prevailing among automobile dealers was followed in regard to the certificate of title to the 1940 Chevrolet. Mrs. Simms endorsed an assignment of the certificate of title on the back of such certificate, and the name of the purchaser was left blank.

In the case before us, the defendants had such confidence in Burke that they permitted him not only to take delivery of used cars traded in as part payment for other automobiles, but also to receive from the owners of cars traded in their certificates of title. Burke, therefore, rightfully came into possession of the certificate of title to the 1940 Chevrolet. While he had the certificate the defendants permitted him to take the Chevrolet from their premises. Without both the automobile and the certificate in his possession,

Burke would have been unable, as the facts disclose, to obtain the loan from the plaintiff corporation.

At the time of making the loan to Burke the plaintiff did not know that he was an employee of the defendants. It relied upon his representation that he was the owner of the Chevrolet and upon the fact that he had the car in his possession and with it the certificate of title, on which appeared his signature as purchaser. The plaintiff is not chargeable with knowledge of the conditions under which Burke came into possession of the car or the certificate of title. Nor is it claimed that the plaintiff was negligent in making the loan to Burke. Nothing is shown to impugn the plaintiff's good faith throughout the transaction.

■ The efficient and proximate cause of the loss was not any criminal act committed by Burke, but the confidence that the defendants placed in Burke, by reason of which he was permitted to have in his possession the certificate of title and the motor vehicle.

A case directly in point here is *Russell v. American Bell Telephone Company*, 180 Mass. 467, 62 N. E. 751. The facts therein are, briefly, the following: Caroline M. Russell was the owner of eight shares of capital stock of the telephone company. At the time of the transaction involved in the litigation she was seventy-five years old and in feeble health but with full mental capacity to transact business. One Charles M. Gleason, a stock broker, was her neighbor and she believed him to be entirely trustworthy.

The telephone company was about to increase its capital stock and had notified its shareholders. Gleason knew that Caroline M. Russell owned eight shares of the telephone company's stock. He called on her, advised her to avail herself of the right to subscribe for

additional stock and offered her his assistance in that connection. Upon his advice she signed a transfer in blank on the back of her stock certificate and delivered the certificate to him for the purpose of having him obtain a new one which would include the new stock to be purchased by her. Instead of surrendering the certificate to the telephone company, Gleason converted it to his own use. He fraudulently represented to the Beacon Trust Company that he was the owner of the stock named in the certificate, and delivered the certificate to the trust company as a pledge to secure his own note for $2,500.

Thereafter Caroline M. Russell died and her executrix instituted a suit against the telephone company, the trust company and Gleason, to require the surrender of the certificate to her and to enjoin the transfer of the eight shares of stock to the trust company. The trial court held in favor of the executrix. Upon appeal the supreme court reversed the decree of that court and entered a decree in favor of the defendant companies.

The executrix urged on appeal that "only the possession of the certificate, not the property, passed to the agent," Gleason, "and that, as the possession was obtained by fraud, it was obtained by larceny in judgment of law". Mr. Chief Justice Holmes, in delivering the opinion of the court, answered that contention as follows:

". . . In Scollans v. Rollins [179 Mass. 346, 60 N. E. 983] it is admitted that the general principle there laid down would not apply to an instrument indorsed in blank and stolen before it had been transferred. We shall not examine the premises of this defense because we can not accept the conclusion. The qualification of the rule, as not applying

when the instrument is stolen, is not based upon the name of the agent's crime but upon the fact that in the ordinary and typical case of theft the owner has not intrusted the agent with the document and therefore is not considered to have done enough to be estopped as against a purchaser in good faith. He certainly has not done enough if the estoppel is based upon the principle that when one of two innocent persons is to suffer the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong. But in a case like the present the agent has been intrusted with the converted property, and it is totally immaterial whether, by a stretch which extends larceny beyond the true field of trespass, his wrong has been brought within the criminal law or not. The ground of the estoppel is present and the estoppel arises.

"The distinction is not new. On the one side are cases like Knox v. Eden Musee Americain Co., 148 N. Y. 441, where an agent or servant simply had access to a document remaining in the possession of the owner; on the other, cases like Pennsylvania Railroad's Appeal, 86 Penn. St. 80, where possession is intrusted to the agent for one purpose and he uses it for another. It can not matter in the latter class that the agent intended the fraud from the outset."

The case from which we have quoted has been extensively cited with approval by state and federal courts. In *National Safe Deposit Company v. Hibbs,* 229 U. S. 391, 57 L. E. 1241, 33 S. Ct. 818, the court, after quoting in its entirety the excerpt from *Russell v. American Bell Telephone Company* hereinabove set out, said:

"We think this case correctly states the principle, and applied to the case in hand is decisive of it. Here one of two innocent persons must suffer and the question at last is, Where shall the loss fall?

It is undeniable that the broker obtained the stock certificates, containing all the indicia of ownership and possible of ready transfer, from one who had possession with the bank's consent, and who brought the certificates to him, apparently clothed with full ownership thereof by all the tests usually applied by business men to gain knowledge upon the subject before making a purchase of such property. On the other hand, the bank, for a legitimate purpose, with confidence in one of its own employes, entrusted the certificates to him, with every evidence of title and transferability upon them. The bank's trusted agent, in gross breach of his duty, whether with technical criminality or not is unimportant, took such certificates, thus authenticated with evidence of title, to one who in the ordinary course of business sold them to parties who paid full value for them. In such case we think the principles which underlie equitable estoppel place the loss upon him whose misplaced confidence has made the wrong possible.''

The principle announced in the two cases from which we have quoted is here controlling. The fact that a certificate of title to a motor vehicle is here involved while those cases concerned certificates of stock shares does not affect the applicability of the rule.

The identical question now before us has not heretofore been passed upon by this court, but the equitable principle upon which the plaintiff relies has frequently been recognized and applied. See, in this connection: *Harth v. Pollock,* 97 Or. 663, 193 P. 202; *Rohrbacher v. Wright,* 99 Or. 186, 195 P. 343; *Vanderpool v. Burkitt,* 113 Or. 656, 234 P. 289; *Hansen v. Bellman,* 161 Or. 373, 88 P. (2d) 295.

Much stress is placed by the defendants on *Schumann v. Bank of California,* 114 Or. 336, 233 P. 860, 37 A. L. R. 1531. The facts in that case are, briefly, the

following: Oregon Eilers Music House was engaged in the sale of musical instruments on conditional sales contracts. In a number of instances, after sales had been made the music company assigned the contracts to the plaintiff "by a written assignment absolute in form attached to each" contract, and delivered both contracts and assignments to the plaintiff. Each month the contracts and assignments were returned to the music company by the plaintiff in order that the company might credit on the contracts the payments that had been made. While the contracts and assignments were in the possession of the music company for that purpose, the music company detached from the contracts the written assignments thereof, executed new assignments, attached the same to the contracts and delivered them to the defendant.

This court held that the plaintiff was not estopped to claim that he was the owner of the contracts as against the bank to which they had been assigned. The decision was based on the ground that the plaintiff had done nothing in connection with the contracts that "put it within the power of the music company, without first committing a crime, to clothe itself with any indicia of ownership or apparent right to dispose of" the contracts. In distinguishing that case from those that we have hereinabove discussed and quoted, and others similar, the following was said:

"Under the facts involved here the analogy is lacking between this case and cases which hold that the true owner of the stock certificate should be estopped if, after signing his name to the transfer on the back thereof, he delivers it for purposes of his own to an agent who, in violation of his trust, fraudulently transfers it to a *bona fide* purchaser."

The decision in *Schumann v. Bank of California,* supra, is not in conflict with our conclusion in the case at bar, to wit, that the defendants are estopped by reason of their acts and conduct from claiming that Burke did not have authority to execute the chattel mortgage here involved.

The decree appealed from is affirmed.