Argued September 7, affirmed October 19, 1960

# VALLEY MOTOR COMPANY *v.* RALLS

355 P. 2d 1100

*Thomas B. Brand,* Salem, argued the cause for appellant. With him on the briefs were Peter M. Gunnar and Richard D. Lee, Salem.

*Leo Levenson,* Portland, argued the cause for respondent. With him on the brief were Clyde R. Richardson and Wheelock, Richardson & Niehaus, Portland.

Before McAllister, C. J., and Rossman, Perry, Goodwin and King, Justices.

GOODWIN, J.

Valley Motor Company, hereinafter referred to as Valley, appeals from a judgment entered for the defendant, Ralls, by the trial court sitting without a jury in an action of conversion.

Both parties are automobile dealers. Valley has its place of business in Salem, and Ralls has his place of business some 40 miles to the north between Oregon City and Milwaukie. The *piece de resistance* was a 1957 Lincoln Capri coupe. At the time of the transaction in controversy, the automobile was worth about $2,550.

For more than one year prior to September 2, 1958, one Donahoe had been employed as a salesman

by Valley. Valley was not open for business on August 31, a Sunday, nor on September 1, which was Labor Day. On September 2, about 9:00 a. m., Donahoe presented himself at Ralls' place of business. He had in his possession both the 1957 Lincoln and its Oregon certificate of title, which had been indorsed in blank by the former owner.

Donahoe truthfully stated that he was employed by Valley, and exhibited to Ralls his business card which had been furnished him by his employer. Thereafter, the truth was not in him.

Donahoe represented that Valley had requested him to "shop" the Lincoln. In the vernacular of the trade, the "shopping" of a used automobile by a salesman of a dealer means to offer it to another dealer for the best cash price obtainable. This practice was common in the trade. Both parties described it in detail. The parties disagreed with reference to accepted ground rules of "shopping", but all agreed that it was a common method whereby a dealer who had a surplus automobile could dispose of it at wholesale to another dealer.

After examining the automobile and the certificate of title, Ralls paid Donahoe $2,550 by check. The check was made payable to Donahoe rather than to Valley. Donahoe thereupon delivered to Ralls the certificate of title. Ralls then drove to Portland with Donahoe, whom he last saw entering a hotel in that city. Donahoe promptly negotiated the check and departed the state.

In due course, Valley discovered that the Lincoln was gone from the used car lot, that Donahoe had not reported to work, and that the certificate of title was missing from the office. Valley's investigators located the automobile at Ralls' place of business. Valley

made demand upon Ralls for the return of the automobile. Ralls declined to return either the automobile or its cash value, and this action resulted.

The trial revealed that Donahoe had stolen both the automobile and the certificate of title during the weekend of September 1, 1958. Ralls conceded that a thief can ordinarily pass no better title than he has, but asserted that an exception is made when the owner of property places it within the power of a wrongdoer to deceive an innocent purchaser for value.

The proven facts tended to counterbalance. On the one hand, Valley had been negligent in leaving the certificate of title in a file which was easily accessible to Donahoe. On the other hand, Ralls had given the agent of a fully-disclosed principal a check made payable to the agent. Cf. Restatement, Agency § 72, Comment b.

The evidence was for the most part undisputed. A bonding company had denied Donahoe an employe-fidelity bond when a routine application had been forwarded by Valley more than a year before the events in litigation. Valley, of course, was under no duty to bond any of its employes. The matter is significant in this case only because Valley was put on notice that Donahoe might be afflicted with a character disorder. Nonetheless, Valley had supplied Donahoe with a key to the office, and had given him the privileges enjoyed by other, bonded, employes. All salesmen, for example, had the right to demonstrate automobiles on Sundays and holidays when the business was not open. However, Valley had specifically forbidden its salesmen, including Donahoe, to remove certificates of title without permission.

The certificate of title for each vehicle on the Valley lot was filed in a file folder within easy reach of any

person who had access to the office. Donahoe had no authority from Valley either to "shop" the Lincoln on the day in question, or to have the certificate of title in his possession.

The certificate of title did not reveal the interest of Valley. The testimony showed that automobile dealers generally refrain from registering their stock in trade in their own names. Instead, they follow the practice of holding the indorsed certificate of title in the office. After a used car is sold, the certificate of title, previously indorsed in blank by the former owner, is forwarded to the state Department of Motor Vehicles to be reissued in the name of the new owner.

The testimony was undisputed that automobile dealers regard the certificate of title, properly indorsed, as "the title" to the vehicle. Dealers and salesmen swore that if "the title matched the car" and was regular on its face they would not make further investigation, particularly if they knew that the other party with whom they were dealing was also in the automobile business.

Ralls swore that his payment of the check to Donahoe was a regular custom in the trade. To understand Ralls' contention that payment to an agent of a disclosed principal in the agent's name is customary in the trade, it is necessary to review briefly the testimony concerning a sales practice in the local automobile business.

When a customer of a new-car dealer brings in a proffered trade item to which he is so greatly attached that the customer and the sales manager can not agree with reference to the amount of a trade-in allowance, there is a likelihood that no sale will result. The salesman then suggests that he take the customer's car out and "shop it around" to see how much cash he can

obtain for it. If enough cash is realized to complete the purchase of a new car to the customer's as well as the dealer's satisfaction, the salesman earns a maximum commission on a "clean" deal. A "clean" sale of a new car is one free of the inconvenience to the dealer of disposing of another used car.

If, in addition to the above-described advantages enjoyed by all concerned, the salesman is able to "shop" the customer's old car for more than the new-car dealer requires in cash, the salesman is entitled to the difference, as an extra commission, or "spiff". The fact that this practice is not widely understood by customers has not kept it from being countenanced in the trade. This, Ralls testified, accounts for the practice of paying salesmen in checks made out in their own names rather than in checks made payable to the salesman's employer.

The above testimony was addressed to the trial court sitting, as we have noted, both as the trier of law and as the trier of fact. The trial court found that Valley was negligent in its dealings with Donahoe, and that Ralls was free from fault in making the check payable to Donahoe in his own name. There was evidence to support a finding that Valley had knowledge of the practice of making checks payable to salesmen. There was evidence that other dealers had in fact made such checks payable directly to other salesmen of Valley, with no protest by Valley.

With the facts thus established, the law was correctly applied by the trial court.

ORS 75.230 provides that one who is not the owner, and who sells the property of another without the owner's consent, can transfer no better title than he has unless the owner is precluded by his own voluntary acts from denying the seller's authority to sell.

■ In a series of cases arising out of fraudulent dealings with automobiles, this court has consistently held that an owner who voluntarily places it within the power of a wrongdoer to defraud an innocent purchaser is denied the right to recover against the innocent purchaser.

In *Richardson v. Bouthillier,* 193 Or 354, 238 P2d 212, the plaintiff carelessly vested a thief with possession of an automobile and a conditional-sale contract. The remedy of claim and delivery was denied in an action against an innocent purchaser who relied upon possession and indicia of equitable ownership in the tort-feasor.

In *Plummer v. Kingsley,* 190 Or 378, 226 P2d 297, the owner of an automobile gave both possession and a certificate of title to a wrongdoer in exchange for a check which was dishonored when presented for payment. In the meantime, the thief sold the automobile to an innocent purchaser. Claim and delivery was denied. We said, "when an owner voluntarily clothes the * * * criminal * * * with indicia of title and delivers to him the possession of the chattel, he will be estopped to assert his title * * *", citing *Commercial Finance Corp. v. Burke,* 173 Or 341, 145 P2d 473, 151 ALR 684, and *Ruddy v. Ore. Auto. Credit Corp.,* 179 Or 688, 174 P2d 603. See Annotation, 151 ALR 690.

The difference between the instant case and the *Plummer case,* supra, is that in the instant case the thief pilfered the certificate of title from the files of an owner who had negligently given the thief the keys to the office after knowing that he had been denied a bond. In the *Plummer case* the instrument of the crime was a spurious bank check. Valley contends in the instant case that the voluntary acceptance of a

spurious bank check from a stranger in exchange for a certificate of title is greater negligence than the voluntary giving of a key to the office to a servant of dubious repute.

Valley would have us distinguish the two cases on the degree of negligence involved. We believe the better rule, and the one supported by modern authority in automobile cases, is that applied by the able trial judge.

In a similar case, the Utah court quoted with approval: " 'Where one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss', *Al's Auto Sales v. Moskowitz* [203 Okl. 611, 224 P2d 591]; * * *." *Heaston v. Martinez,* 3 Utah 2d 259, 263, 282 P2d 833.

■ The trial judge found that the making of the check payable to Donahoe in the face of knowledge that Donahoe was the agent of a disclosed principal was an accepted practice in the trade, and that Valley had knowledge of the practice. Thus, the trial court was of the opinion that Valley's primary negligence in giving Donahoe access to the automobile with its certificate of title put it within Donahoe's power to carry out his scheme, and that it was Valley's negligence rather than any subsequent fault on the part of Ralls which directly caused the loss. The subsequent payment to Donahoe by Ralls was considered to be a reasonably foreseeable result of the original negligence. This is a fact the trial court was entitled to find.

■ The trial court expressed from the bench the view that the certificate of title was "almost negoti-

able." This description of the local usage concerning indorsed certificates of title was supported by testimony. A certificate of title is *prima facie* evidence of ownership. ORS 481.115. A purchaser of a vehicle who receives a properly indorsed certificate of title in circumstances which would not put an ordinary person on inquiry is protected when the owner is estopped to assert title because of misplaced trust in the wrongdoer. *Commercial Finance Corp. v. Burke,* supra. In the last-cited case, this court quoted at length from *Russell v. American Bell Telephone Co.,* 180 Mass 467, 62 NE 751, which involved stock certificates.

The cases dealing with indorsed stock certificates prior to the enactment of the Uniform Stock Transfer Act (ORS ch 58) are instructive in a case involving a certificate of title. Neither document is a negotiable instrument. In order to cut off the rights of the owner in such cases, there must be sufficient negligence or voluntary conduct on the owner's part to constitute an estoppel. Under the stock transfer acts, now widely adopted, the bearer of an indorsed stock certificate, by transfer to an innocent purchaser, can cut off equities of an owner whose only negligence was in failing to safeguard the indorsed paper. *Peckinpaugh v. H. W. Noble & Co.,* 238 Mich 464, 213 NW 859, 52 ALR 941.

Even if it were not negligence to leave indorsed stock certificates or automobile-title certificates where they may fall into the hands of the easily tempted, such conduct must be given weight in considering which of two innocent persons must suffer. A rule which is logically sound and widely accepted with reference to stock certificates indorsed in blank is equally sound when applied to a certificate of title

indorsed in blank and accompanied by possession of an automobile.

■ Valley contends that the authorities relied upon by Ralls are cases where the owner voluntarily, although mistakenly, entrusted the wrongdoer with the indicia of ownership. This is true. However, we adopt the rule that one who continues after notice to employ untrustworthy help and who leaves indorsed certificates of title within the easy reach of such persons has by his voluntary conduct estopped himself to assert title against an innocent purchaser.

Affirmed.