Argued October 9, 1961, affirmed March 28, 1962

# SOUTH SEATTLE AUTO AUCTION, INC. *v.* LADD

370 P. 2d 630

*Edward M. Murphy,* Roseburg, argued the cause for appellant. On the brief were Yates, Murphy & Carlson.

*Gale P. Hilyer,* Seattle, Washington, argued the cause for respondent. With him on the brief was Harrison R. Winston, Roseburg.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

LUSK, J.

This is an action in claim and delivery brought by South Seattle Auto Auction, Inc., a Washington corporation, to recover from the defendant LeRoy Ladd, dba Pal Motors of Oregon, Ltd., an Oregon limited partnership, the possession of three automobiles or their value. The defendant, in addition to denying the allegations of the complaint, which is in the usual form, alleged facts which it is claimed estop the plaintiff from asserting its right to possession of the chattels. A trial before the court without a jury resulted in a judgment for the plaintiff from which the defendant has appealed.

During the times with which the case is concerned, the plaintiff was engaged at Seattle, Washington, in the business of selling used cars to dealers at auction. It did business with three or four hundred dealers located in the states of Washington, Oregon, Idaho, and California and sold or listed for sale from 200 to 450 cars a week. One Virgil Anderson had been an

employee of a used car dealer in Salem engaged in buying cars for his employer and taking them to Seattle to be sold at the plaintiff's auction. In late 1958 or early 1959 plaintiff entered into an oral arrangement with Anderson under which the latter was to buy used cars at wholesale, clean them up, and repair them in his shop in Salem and transport them to Seattle to be sold at the plaintiff's auction. Anderson lacked funds with which to pay for the cars he bought and, in accordance with the understanding, when he bought a car he would draw a sight draft on the plaintiff and deliver it to the selling dealer, who would transmit the draft to the plaintiff accompanied by the certificate of title to the car and the plaintiff would honor the draft. Anderson took possession of the car and after it was cleaned up and sold at auction he would receive any amount it brought in excess of the amount of plaintiff's advance, less $25, the regular auction fee charged by the plaintiff. If, however, there was a loss on the sale, Anderson stood the loss. If a car did not bring an adequate price when put on the block the first time, it was sold at the next auction, held the following week, for the highest price bid. For the purpose of securing the plaintiff against loss, Anderson deposited with the former $1,000 in cash. Before the relation between the parties terminated this entire sum had been withdrawn by the plaintiff to cover such losses.

Anderson was an exceptionally well qualified buyer and the arrangement was considered by the plaintiff an advantageous one for it, not only because of the $25 auction fee, but because the good class of cars which Anderson brought to the auction attracted customers and increased the volume of plaintiff's business.

During the period of a year or more that the agreement was in effect, Anderson bought some 200 cars which were paid for by the plaintiff in the manner above outlined. All these cars, however, were not taken to Seattle and sold at plaintiff's auction. That came about in this wise: During the last few months of the year 1959 the market for used cars dropped and Anderson was unable to make a reasonable profit from the sale of the cars at auction. To meet this situation Anderson obtained permission of the plaintiff to sell cars directly to Oregon dealers. Mr. Robert W. McConkey, president of the plaintiff corporation, testified that the plaintiff did not like this practice, but permitted it and that "[h]ad we not allowed him to do that, we would have put the man out of business, * * *." As to any particular car, however, the witness testified that he did not know "that he [Anderson] had sold the car to another dealer other than one of our customers, until he came up the next week without having the car in his possession. And then I would find out the car had been disposed of down here some place [that is in Oregon]." In all, 50 cars bought by Anderson pursuant to the agreement never reached Seattle, but were sold by Anderson "on the road", as the witnesses expressed it.

In late 1959, according to the testimony of William H. Johnson, auctioneer and vice president and one of the two operating managers of the plaintiff, it came to his attention that Anderson was not bringing to the auction all the cars that he was buying, and he told Anderson "that we just couldn't keep on having our money in these cars unless the cars were coming to the sale. That's what we made the deal for to get cars. That we wanted those cars in the sale or we just couldn't do any more business."

The evidence further shows that Anderson, when he could do so advantageously, traded cars in Oregon and transported to Seattle the car which he received in trade to be sold at auction. How many transactions of this kind there were and just when the practice commenced, the evidence does not disclose.

In either case, whether it was a sale or a trade, the plaintiff would send to the Oregon dealer the title to the car which Anderson had bought with a sight draft, upon receiving the return of its investment either through sale at auction of the car taken in trade by Anderson, or through payment of the purchase price by the dealer who had bought from Anderson. In all cases Anderson was required to pay the $25 auction fee.

Two of the cars involved in this case, a 1958 Chevrolet and a 1959 Chevrolet, were purchased by Anderson from dealers in Oregon and sold by him to the defendant, a licensed dealer in Roseburg. The third car, a 1959 Oldsmobile, was bought by Anderson from the plaintiff, but never paid for, and likewise sold to the defendant. This transaction calls for separate treatment and its details will be stated later.

Early in 1960, Anderson bought a 1958 Chevrolet from Madras Main Street Garage of Madras and a 1959 Chevrolet from Elsner Motor Company of Salem. In each instance the plaintiff paid a draft for the purchase price to the selling dealer and received from the latter the certificate of title to the car with the assignment on the back thereof properly endorsed. The price of the 1958 Chevrolet was $1,750, and of the 1959 Chevrolet $2,150. The certificates of title have ever since remained in the possession of the plaintiff.

On February 9, 1960, Anderson delivered possession of the 1958 Chevrolet to the defendant and gave

the defendant a bill of sale for it; on February 15, 1960, he delivered to the defendant possession of the 1959 Chevrolet and the 1959 Oldsmobile and likewise gave the defendant bills of sale for these cars. As the purchase price, Anderson received for the 1958 Chevrolet $1,850; for the 1959 Chevrolet $2,275; and for the Oldsmobile $2,590. No part of the proceeds of these sales was remitted by Anderson to the plaintiff.

Discovery by the plaintiff that Anderson had not paid for the Oldsmobile and concern over his failure to bring in the Chevrolets led Mr. McConkey to take a trip to Salem to see Anderson, from whom he learned of the disposition that had been made of the cars. McConkey and Anderson then went to Roseburg to see the defendant. McConkey and the defendant each claimed ownership of the cars and, as they were unable to adjust the matter, plaintiff filed this action.

McConkey at this time learned also from Anderson that the latter had sold three other motor vehicles, titles to which were held by the plaintiff, without accounting to the plaintiff for its share of the proceeds.

Apart from an assignment of error directed to the admission of evidence, defendant in his brief makes two contentions: first, that the court erred in finding that the plaintiff, not Anderson, was the owner of the Chevrolets at the time of the purported sales to the defendant; second, that the plaintiff is estopped to deny Anderson's ownership.

At the outset it must be remembered that this is an action at law and that if there is substantial evidence to support the findings of the court below, this court is without power to disturb them.

Upon the first question the defendant contends that the evidence shows that the relationship between An-

derson and plaintiff was that of debtor and creditor and that "when Anderson bought the two Chevrolet automobiles with plaintiff's sight drafts, Anderson became the owner of the automobiles and a debtor of the plaintiff."

■■ When the arrangement was made between the plaintiff and Anderson, nothing was said as to who was to be the owner of the cars which Anderson might buy. McConkey testified that "Anderson was to buy cars for us", Johnson, that he "assumed" that plaintiff was the owner because it paid for them, and Anderson expressed an opinion to the same effect. Assumptions or opinions of witnesses are not competent evidence of ownership, *Klingback v. Mendiola,* 138 Or 234, 240, 6 P2d 237; *Steel & Iron Co. v. Cornfoot et al.,* 116 Or 83, 93, 240 P 229, though in a case like this where the evidence is entirely oral and the making of the agreement attended with a minimum of formality and attention to detail the testimony referred to which came in without objection is relevant on the question of intention.

The facts upon which defendant relies are that Anderson had a free hand in buying cars; that he made the decision as to what repairs should be made and reconditioned the cars in his own shop and at his own expense; that he sold 50 cars directly to dealers, traded some cars, received the profits from sales, if there were profits, and stood the loss, if any, and deposited $1,000 with the plaintiff to protect it from loss. Over against these considerations are the following: The plaintiff held the certificates of title which were assigned to it by the selling dealers with the evident intention of transferring the property in the vehicles to the plaintiff.

■ An endorsement or assignment by the owner on

the back of a certificate of title to a motor vehicle is competent evidence on an issue of ownership, *Hayes v. Ogle,* 143 Or 1, 7, 21 P2d 223; and the failure of the transferee of the certificate of title to notify the department of motor vehicles of the transfer, as required by ORS 481.405, does not affect the validity of the sale, but the transferee's "title is good against the world, except such persons, creditors or innocent purchasers who have been misled by the record or by failure to make the proper changes in the record." *Thiering v. Gage et al.,* 132 Or 92, 103, 104, 284 P 832.

The sales by Anderson to Oregon dealers, with the exception of the sales of the cars here in question to the defendant, were made with the permission of the plaintiff at the request of Anderson. That permission had been withdrawn at the time of the sales of the Chevrolets by Anderson to the defendant.

■■ In cases involving contracts of consignment where the question is whether the transaction is a sale or a consignment for sale on account of the consignor, if a liability to pay a fixed price for the goods arises at the time of the consignment, the transaction is usually regarded as a sale transferring title to the consignee. 46 Am Jur 213, Sales § 18. Applying the analogy of this rule, Anderson did not acquire title to a car upon taking possession of it, for his liability was a contingent one which did not arise until the loss on the sale of the car occurred. His possession was that of a bailee with a contractual duty to repair and recondition the car and transport it to Seattle for the purpose of sale at the auction.

■ We think that the evidence warranted the court's finding that the plaintiff was the owner and entitled to the immediate possession of the Chevrolets.

■ If, however, it were to be conceded that Ander-

son became the plaintiff's debtor for the price of the car at the time of its purchase then the only reasonable construction of the transaction is that the plaintiff held the certificates of title as security for the advances made by it to Anderson. Whatever interest Anderson may have had in the cars was subject to the security interest of the plaintiff, as evidenced by the certificates of title and the understanding of the parties, not, it is true, expressed, but necessarily implied from the circumstances. Anderson could not transfer title to these cars because he did not have the title and he could not warrant the title as he attempted to do in the bills of sale which he executed to the defendant.

If the certificates of title were held by the plaintiff as security for advances on Anderson's account, then the plaintiff was in the same position as a mortgagee in a chattel mortgage who was entitled to maintain an action of replevin after condition broken. As we said in *Case T. M. Co. v. Campbell,* 14 Or 460, 466, 13 P 324, quoted with approval in *Commercial Securities, Inc. v. Mast,* 145 Or 394, 401, 28 P2d 635, 92 ALR 194: "It may be well said, * * * that a chattel mortgage simply creates, in the outset, a mere lien upon the property, and vests no title in the mortgagee; but that cannot be said after the conditions of the mortgage are broken. Then a new right arises which is a legal right. The mortgagee becomes invested with a special property in the thing." In such circumstances, as the cases cited and many others reviewed in *Commercial Securities, Inc. v. Mast* hold, the mortgagee is entitled to maintain an action of replevin. Similarly, it was held in *First National Bank v. Dearborn,* 115 Mass 219, 15 Am Rep 92, that the delivery by an owner of goods of a common

carrier's receipt for them, not negotiable in its nature, as security for an advance of money, with the intention to transfer the property in the goods, is a symbolical delivery of them, and vests in the person making the advance a special property in the goods, sufficient to maintain replevin to recover their possession. See, also, *Holbrook v. Wight,* 24 Wendell (NY) 168; 46 Am Jur 19, Replevin § 29.

The record shows that the parties to this action stipulated that the value of the 1959 Chevrolet was $2,150 and of the 1958 Chevrolet $1,725. As above stated, the plaintiff paid $2,150 for the 1959 Chevrolet and $1,750 for the 1958 Chevrolet. Thus, the amount of the plaintiff's advances, if that is what they were, in the one case exceeded and in the other equaled the value of the car and Anderson had no interest in them on any theory.

On the assumption that the plaintiff was the owner of the cars, and that, as the plaintiff asserts, Anderson was its agent, the defendant asserts two propositions: first, that Anderson had apparent authority to sell the Chevrolets to the defendant, and second, that plaintiff is estopped to assert its title under ORS 75.230.

To support the first proposition, the defendant points to the course of dealing between Anderson and the plaintiff, principally the sales of over 50 cars by Anderson to Oregon dealers, and the trading of other cars. In our opinion, apparent authority is not in the case, for a person cannot set up an apparent authority unless he relied on it when he entered into the transaction, nor can a person who deals with an agent, not as agent but as principal, set up an apparent authority which the agent may be said to have. *Essex Co. Acceptance Corp. v. Pierce-Arrow Sales Co.,* 288

Mass 270, 192 NE 604, 95 ALR 1314, Annotation 95 ALR 1319; Restatement, 1 Agency 2d, § 8, Comment, p 31; 1 Mechem on Agency (2d ed) 510-512. All the evidence shows that the defendant dealt with Anderson not as an agent, but as a principal, and there is no evidence that at the time of the transactions involved he knew of or relied on the course of dealing which is now said to have created the appearance of authority in Anderson to sell the automobiles.

In support of the second proposition the defendant urges that the plaintiff is estopped from asserting its title because it created a "deceptive situation created by the true owner and relied upon by the subsequent purchaser." 2 Williston on Sales (rev ed) 244, § 312.

■ The general rule in this regard is written into subsection 1 of ORS 75.230, which reads:

"Subject to the provisions of this chapter, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell."

More specifically, it is held that an owner of a chattel who clothes another with what are called the indicia of ownership of such chattel will be estopped to assert his title as against a bona fide purchaser. But merely entrusting another with the possession or control of property is not sufficient to estop the true owner from asserting title against one who has purchased from the possessor in reliance upon the latter's apparent ownership. *Plummer v. Kingsley*, 190 Or 378, 390, 226 P2d

297; 2 Williston on Sales, supra. As stated by Williston:

"* * * If the owner of goods is responsible for or cognizant of no other deceptive circumstances, it is an entirely proper thing for him to intrust another with the goods either for the advantage of the owner or of the possessor, and the law has never attempted to debar the owner from so doing. He may intrust his goods to another to be repaired or he may lend them to another for the latter's use or he may lease them for hire, and still reclaim them from one who has innocently given value for them to the bailee."

In cases arising out of the sale of an automobile by a dealer who does not own it and has no authority to sell it, a purchaser who does not obtain the title papers, or relies on the dealer's promise to furnish the papers later, and who makes no effort to ascertain the true ownership, has been held to acquire no title as against the owner. *Eatonville State Bank v. Marshall,* 170 Wash 503, 17 P2d 14; *Deahl v. Thomas* (Tex Civ App) 224 SW2d 293; *Amarillo Auto Auction, Inc. v. Hutchinson,* 135 Colo 320, 310 P2d 715; 7 Blashfield, Cyclopedia of Automobile Law and Practice (perm ed) 224, § 4357. Where, however, the owner of an automobile places it in the possession of a dealer for the purposes of sale knowing that the dealer would hold out and advertise itself as the owner of the automobile and as having the right to sell it, and permits the dealer to exhibit the car for sale in its sales room, it is held that the owner has thereby clothed the dealer with such apparent ownership and authority to sell that it ought to be estopped to assert its title as against an innocent purchaser for value. *Jones v. Commercial Investment Trust,* 64 Utah 151, 175, 228 P 896; *Commercial Motors Mtg. Corp. v.*

*Waters,* 280 Pa 177, 124 A 327; *Winakur v. Sapourn,* 156 Md 662, 675-678, 145 A 342; *Rasmussen v. Lee & Co., Inc.,* 104 Mont 278, 66 P2d 119. The Ohio courts, however, have refused to apply this doctrine to the sale by one dealer to another of an automobile subject to an encumbrance under what is known as "Floor Plan Financing" on the ground that a dealer is informed, or should be, on the subject of this type of financing. *Associates Discount Corp. v. Main Street Motors* (Ohio) 113 NE2d 734, app d 157 Ohio St 488, 105 NE2d 878. These cases are not in point here because there is no evidence that the defendant knew that Anderson was exhibiting the Chevrolet automobiles for sale either on the floor of an automobile agency's sales room or at any other place.

■ Here it should be noted that there is evidence, disputed by the defendant it is true, but sufficient to justify a finding, that the defendant knew that Anderson lacked cash to buy cars, that he was concerned about paying Anderson for the cars involved without the titles, and that he knew that the titles would have to come through the plaintiff.

■ It is true, as counsel for the defendant point out, that failure to comply with the automobile registration statute does not invalidate the sale of an automobile. *Maxwell Co. v. So. Ore. Gas Corp.,* 158 Or 168, 172, 74 P2d 594, 75 P2d 9, 114 ALR 697, and cases there cited. That rule, however, does not aid the defendant, because we are not concerned here with the sale of an automobile by its owner without delivery of a certificate of title, but with an unauthorized sale of an automobile by one who does not own it and with the right of the owner to recover his property from the purchaser. In such a case the title becomes important, both because of its prima facie value as evi-

dence of ownership and because, as the record discloses, among used car dealers the recognized custom is to treat the certificate of title as the title to the car. In view of similar evidence in *Valley Motor Co. v. Ralls,* 224 Or 290, 298, 355 P2d 1100, we said:

> "A purchaser of a vehicle who receives a properly indorsed certificate of title in circumstances which would not put an ordinary person on inquiry is protected when the owner is estopped to assert title because of misplaced trust in the wrongdoer."

In that case the owner of an automobile was held estopped to assert its title as against the claim of an innocent purchaser because the former, an automobile dealer, had given one of its salesmen, whose trustworthiness was known to be doubtful, access both to the car and the certificate of title to it, thus enabling the salesman to perpetrate a fraud by selling the car and converting the purchase price to his own use. The owner was held to have been guilty of culpable negligence and the rule was applied that where one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who, by his conduct, created the circumstances which enabled the third party to perpetrate the wrong. Other Oregon cases involving the sales of automobiles where the innocent purchaser was held to be protected were all cases in which the owner had entrusted the certificate of title or some other evidence of ownership than the mere possession of the car to the wrongdoer. See *Richardson v. Bouthillier,* 193 Or 354, 238 P2d 212; *Plummer v. Kingsley,* supra; *Commercial Finance Corp. v. Burke,* 173 Or 341, 145 P2d 473, 151 ALR 684; *Ruddy v. Ore. Auto. Credit Corp.,* 179 Or 688, 174 P2d 603.

The evidence discloses that the defendant, in pur-

chasing the automobiles, relied exclusively on Anderson's possession of them and the fact that he knew Anderson, with whom he had done business before, and had confidence in him. The defendant did not even ask Anderson where the titles were. He conceded that he would not buy an automobile from a stranger without obtaining the certificate of title. To that extent his testimony tended to agree with evidence on behalf of the plaintiff to the effect that according to the custom and usage of the trade among used car dealers, automobiles are not bought and paid for unless the endorsed certificate of title is delivered to the purchaser.

■ The defendant objected to this testimony about custom and the ruling admitting it is assigned as error. ORS 75.180, which provides that evidence of usages of the trade may be received for the purpose of ascertaining the intention of the parties as to the time when the parties intend that property in specific or ascertained goods is to be transferred, was relied on at the trial by the plaintiff for the admission of this evidence and is again invoked in this court. The defendant says that there was no question as between Ladd and Anderson as to when title should pass and, therefore, the statute is irrelevant. However that may be, we think that the evidence was relevant upon the question of defendant's negligence and his right to claim the position of a bona fide purchaser for value. Actually, the evidence went less to the question of the time when the parties intended that the property should be transferred than to the question of the importance attached by the trade to the certificate of title in the purchase of used cars, as shown by the fact that customarily a dealer will not pay over money for a used car until he gets the certificate of title to it. The usage appears to be sufficiently general to

authorize the presumption that the defendant, who had engaged in the used car business as a licensed dealer for many years, was aware of it. *Hurst v. Lake & Co.,* 146 Or 500, 31 P2d 168. It is the same character of evidence as was received without objection in the case of *Valley Motor Company v. Ralls,* supra, and concerning which the court there said:

"The testimony was undisputed that automobile dealers regard the certificate of title, properly indorsed, as 'the title' to the vehicle. Dealers and salesmen swore that if 'the title matched the car' and was regular on its face they would not make further investigation, particularly if they knew that the other party with whom they were dealing was also in the automobile business." 224 Or at 294.

In the *Valley Motor Company* case the evidence was received for the purpose of showing that the defendant was justified in buying the car from a fraudulent salesman who had in his possession not only the motor vehicle, but also the certificate of title to it. Here it was received for the purpose of showing that the defendant was wanting in ordinary care in buying and paying for the cars without the certificates of title. In our opinion, the evidence was properly admitted.

Our conclusion upon this branch of the case is that the plaintiff was either the owner of the Chevrolet automobiles at the time of the commencement of this action, or had such a special property in them as entitled it to maintain an action for their possession, and that the evidence does not support the defendant's claim of estoppel.

The question concerning the Oldsmobile is relatively simple. According to the testimony of Mr. Johnson, Anderson undertook to buy this car from the plaintiff after it had failed to bring the minimum

price when offered at the auction. Without paying the purchase price Anderson drove the car to Oregon and sold it to the defendant as heretofore stated. The plaintiff then purchased the car from the former owner who had previously consigned it to the auction for sale.

The sale to Anderson was to be for cash and was subject to a rule of the plaintiff that the title to a car did not pass until the purchaser's check was honored by the drawee bank. This rule was known to Anderson. It was posted on the plaintiff's premises and printed on its invoices. There is some evidence that the rule was waived by the plaintiff in this instance, but the conflict was resolved by the court against the defendant and its decision, of course, is binding here.

Customarily, a purchaser was permitted, before paying for a car, to take it out on the road for a short distance to determine whether it was in good running order. Apparently Anderson, under the pretext of exercising this privilege, drove the car away from the plaintiff's premises and didn't stop until he reached Salem.

It is clear that in these circumstances Anderson never acquired title to the Oldsmobile. *Plummer v. Kingsley,* supra, 190 Or at 384; *Mogul Transportation Co. v. Larison,* 181 Or 252, 260, 181 P2d 139; *Keegan et al. v. Lenzie,* 171 Or 194, 217, 135 P2d 717.

As in the case of the Chevrolets, Anderson did not have the certificate of title to the Oldsmobile, but only the naked possession of the car, and what has heretofore been said on the subject of estoppel applies equally to this transaction. As to all three motor vehicles involved, the findings of the circuit court are supported by the evidence.

The judgment is affirmed.