# FIRST INTERSTATE BANK OF OREGON, N.A.,
*Respondent,*

*v.*

# BERGENDAHL et al,
*Appellants.*

## (A8107-04330; CA A30857)

723 P2d 1005

John E. Frohnmayer, Portland, argued the cause for appellants. With him on the briefs were Barbee B. Lyon and Tonkon, Torp, Galen, Marmaduke & Booth, Portland.

Douglas M. Ragen, Portland, argued the cause for respondent. With him on the brief were Michael E. Arthur, William H. Walters and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

First Interstate Bank seeks to enforce unlimited and continuing personal guarantees that were allegedly authorized by Bergendahl, Craig and B.C. Farming, Inc. (defendants), relating to loans made by First Interstate to Sunriver Farms, Inc., of Oregon (SunOre) for the farming of Sabre Farm in northeastern Oregon and Three Wells Farm in southeastern Washington. Defendants appeal from a judgment holding them to the guarantees. We reverse as to B.C. Farming and otherwise affirm.

The veritable mountain of facts[1] can be distilled considerably, because the legal question on which the case turns is narrow: whether defendants authorized or ratified the signing, on their behalf, of personal guarantees for the bank loans.[2] The guarantees were purportedly signed for defendants by Jones, treasurer of Sunriver Farms, Inc., of California (SunCal), and were allegedly authorized by separate agricultural management agreements signed by each defendant and a subsequent partnership agreement entered into by Bergendahl and Craig.[3]

Defendants invested in Sabre Farm primarily for tax reasons.[4] The identical agricultural management agreements, signed by each of them as "owners," required SunCal to manage their farming businesses and authorized SunCal, as agent and "attorney-in-fact,"[5] to carry out the budget and

---

[1] *See First Interstate Bank v. Tex-Ark Farms,* 71 Or App 427, 440, 692 P2d 678 (1984), *rev allowed* 299 Or 251 (1985), a case involving the same general series of transactions but different parties.

[2] The discussion with regard to B.C. Farming is largely academic; the corporation is insolvent.

[3] Both agreements provide that they are to be governed by the laws of California. We are free to apply Oregon law when there is no apparent conflict between the two. *Deerfield Commodities v. Nerco, Inc.,* 72 Or App 305, 316, 696 P2d 1096, *rev den* 299 Or 314 (1985).

[4] They would be able to deduct up to three times their capital contribution, provided that they were "at risk" for the additional amounts beyond their actual investments. IRC § 465(b)(1).

[5] For example, the Bergendahl management agreement provides:

"*Agent (With Limited Power of Attorney).* Manager is authorized as an agent and attorney-in-fact of Owner to carry out the budgets and business plans attached hereto as Exhibit A including all amendments thereto. This authority includes the power to enter into agreements, and restricted power to arrange loans,

farming plan attached to each agreement as "Exhibit A." SunCal's express authorization included the power to

> "enter into agreements, and restricted power to arrange loans, credit and borrow money, sign Bill of Sale drafts on behalf of Owner * * * and to sign or endorse any documents on behalf of Owner in pursuance of the foregoing. * * *"

The Farming Plan and Budget for the 1979-80 crop year stated that each "owner" (each defendant) agreed to a budget for that crop year which provided that a specified amount of capital would be contributed by each "owner" and that a recourse loan of approximately three times that amount would be assumed by each of them.[6] In the main body of each agreement, each defendant agreed to be liable for the loan. SunCal was not expressly authorized to sign defendants' names to guarantees for loans made to third parties. The management agreements, signed by each defendant and by Behrens, as president of SunCal, did not refer to any specific property or farming enterprise.

In a subsequent partnership agreement, Bergendahl, Craig and others became limited partners in a business organized expressly for the purpose of farming Sabre Farm. B.C. Farming did not become a limited partner, but it did invest in the venture. The general partners, including SunOre, which is a wholly owned subsidiary of SunCal, were given "full, exclusive and complete discretion in the management and control of the business of the partnership * * *." They were authorized:

---

credit and borrow money, sign Bill of Sale drafts on behalf of Owner, purchase seed, fertilizer, etc., enter into leases and rental agreements, pay bills and other operating expenses, and to sign or endorse any documents on behalf of Owner in pursuance of the foregoing, and to modify or cancel agreements. The Manager will open up a bank account for the Allan Bergendahl (farming account) and be empowered to write checks on said account for the express purpose of conducting the farming business for Owner."

[6] For example, Bergendahl's budget provides:

"The Owner agrees to the following funding budget for the 1979-80 crop year:

| | |
|---|---|
| Equity Capital Contributed | $125,000 |
| Recourse Loans Assumed (maximum) | 375,000* |
| Total Crop Planting Cost (in 1979) | $500,000 |

"* * * * *

"*Could vary up to 10 percent plus or minus, depending upon final crop budget."

"(a)   To borrow money in such amounts, on such terms and conditions and at such rates as the General Partners deems [*sic*] appropriate * * *

"* * * * *

"(d)   To execute, on behalf of the partnership, any and all documents or instruments of any kind which the General Partners may deem appropriate in carrying out the purposes of the partnership, including, without limitation, powers of attorney, sale contracts or other documents or instruments of any kind or character or amendments thereto. * * *"

They were also granted a "special and limited" power of attorney authorizing them to sign certain documents for the limited partners. The power of attorney provision included examples of documents relating to the continued existence and termination of the partnership.[7] The agreement further provided that each partner was to be liable for the repayment of partnership loans in an amount up to three times his capital investment.[8] At each limited partner's signature line was

---

[7] The power of attorney contained in the limited partnership agreement provides:

"10.09 *Power of Attorney.* The General Partners shall have at all times during the existence of the Partnership, and is [*sic*] hereby granted by each Limited Partner, a special and limited power of attorney as the attorney-in-fact for each Limited Partner, with power and authority to act in the name and on the behalf of each Limited Partner to execute, acknowledge and swear to in the execution, acknowledgement and filing of documents, which shall include, by way of illustration but not of limitation, the following:

"(a)   the Agreement, any separate certificates of limited partnership, as well as any amendments to the foregoing which, under the laws of the State of California, or the laws of any other state, are required to be filed or which the General Partners deem is advisable to file;

"(b)   any other instrument or document which may be required to be filed by the Partnership under the laws of any state or by any governmental agency, or which the General Partners deem it advisable to file; and

"(c)   any instrument or document which may be required to effect the continuation of the Partnership, the admission of an additional or substituted Limited Partner, or the dissolution and termination of the Partnership (provided such continuation, admission or dissolution and termination are in accordance with the terms of the Agreement), or to reflect any reductions in amount of contributions of Limited Partners."

[8]

"5.03 *Liability of Limited Partners.* Borrowings will be required to finance the business of the Partnership. The General Partners anticipate that substantial loans will be arranged on behalf of the Partnership in connection with the Partnership's 1979-80 crop program. The Limited Partners will have personal liability for repayment of such loans in the amount of up to three times their capital investment. All proceeds received by the Partnership from the sale of crops

shown the amount of capital to be contributed by that partner and the amount of the recourse loan to be assumed, which was the same amount as each partner's personal liability to the partnership. The agreement did not expressly authorize the general partners to sign personal guarantees for the limited partners for loans made to SunOre for partnership purposes. Behrens signed the partnership agreement for each limited partner, as president of SunCal, their agent.

First Interstate lent money to SunOre, in its corporate capacity, for the farming of Sabre Farm. In negotiations leading up to the loan, the bank's final proposal had conditioned the loan on its obtaining personal guarantees of Bergendahl, Craig and others. Jones signed guarantees for each defendant as their sub-agent through SunCal.[9] He never sent copies to defendants. The guarantees were for the same amounts for which each defendant had agreed to be personally liable in the management agreements and the limited partnership agreement. Much of the bean crop was lost, and SunOre defaulted on its loan.

■   The parties' first dispute concerns whether the management agreements were superseded by the partnership agreement. There is substantial evidence to support the trial court's finding that the parties intended the two documents to operate simultaneously. The management agreements, executed on October 15, 1979, between defendants and SunCal, expressly provided that they were to remain in effect until January 15, 1985, unless terminated earlier by written notice. The partnership agreement, executed on November 26, 1979,

---

shall be applied first to the repayment of such loans. If, however, in the judgment of the General Partners, the proceeds from the sale of the crops will not be sufficient to repay the crop loans in full prior to June 30, 1981, then the General Partners may make a call on the Limited Partners on or before June 30, 1981 to contribute additional capital to the Partnership of up to three times their capital investment for the sole purpose of repaying the crop loans. Any amount of such call proceeds not needed for the repayment of crop loans shall be returned forthwith to the contributing Limited Partners. The liability of the Limited Partners for debts and obligations of the Partnership shall be limited to their capital contributions plus their share of undistributed profits except as otherwise provided in this paragraph."

[9] Each defendant's name was typed on the signature line of the guarantee. The guarantee was then signed by Jones, "Treasurer of Sunriver Farms of California, Inc., Power of Attorney." The parties do not dispute Jones' authority to act as defendants' sub-agent through SunCal.

between defendants Bergendahl and Craig as limited partners and SunOre, among others, does not expressly supersede the management agreements, and there is no other writing terminating them. The partnership agreement was signed for defendants by Behrens, president of SunCal. Defendants do not challenge his authority to bind them to the partnership agreement. There is also evidence that, after the execution of the partnership agreement with SunOre, Bergendahl and Craig regarded SunCal as their agent. There is no evidence that they regarded the management agreements as having been terminated or superseded. Those agreements were between different parties and concerned different subject matters. They are not inconsistent with the partnership agreement, were not superseded by it and will be construed with it. *See Nicholson v. Hardwick,* 49 Or App 169, 619 P2d 925 (1980), *rev den* 290 Or 653 (1981).

■ In a meticulous and thoughtful opinion, the trial court concluded, from its interpretation of the agricultural management agreements, the limited partnership agreement and extrinsic evidence, that Jones, through SunCal and as defendants' agent, was authorized to sign defendants' names to personal loan guarantees for loans First Interstate made to SunOre for the purposes of farming Sabre Farm and Three Wells. Although we disagree with that conclusion, we agree with the court's alternative conclusion that defendants Bergendahl and Craig ratified the execution of the guarantee by Jones.

■ SunCal had no express authority to sign personal guarantees on behalf of defendants. Whether it could be implied from the agreements and from other circumstances that its agent, Jones, had that authority depends on whether the authority was reasonably incident to the expressly authorized transactions and necessary to accomplish the objectives of the agency. *Beeson et al. v. Hegstad et al.,* 199 Or 325, 261 P2d 381 (1953); *Rosenberg v. C.W. Clarke Co.,* 200 Cal App 2d 178, 19 Cal Rptr 191 (1962). The authority conferred by the documents is to be strictly construed. *Coulter v. Portland Trust Co.,* 20 Or 469, 26 P 565 (1891).

As we have stated, Bergendahl and Craig became limited partners. The partnership agreement authorized the

general partners to execute documents *on behalf of the partnership* that they deemed appropriate for the general operation of the business. It did not, however, authorize them to execute general operation documents *on behalf of the limited partners* that would increase their liability as limited partners. The only provision in the agreement authorizing the general partners to sign anything on behalf of the limited partners was the "special and limited" power of attorney. *See* n 7, *supra.* The examples of documents given there pertain to the continued legal existence or termination of the partnership. The guarantees are not similar to those types of documents. Although those examples are expressly given "by way of illustration but not of limitation," we conclude that only documents of a like kind were included within the authorization and that, if the parties had intended the general partners to have the authority to sign documents related to the limited partners' financial liability, they would have included such an authorization expressly within the limited power of attorney.

More importantly, the section of the agreement entitled "Liability of Limited Partners" established the limited partners' liability for repayment of partnership loans. *See* n 8, *supra.* It is a statement of the partners' maximum obligation *to the partnership.* It is effective on call only and does not provide authority for the signing of personal guarantees for a loan to the partnership. *See First Interstate Bank v. Tex-Ark Farms, supra,* 71 Or App at 440. The guarantees created a new liability of the limited partners *to First Interstate* that was not contemplated by that provision. We conclude that the partnership agreement is not ambiguous concerning the question at issue and that, as a matter of law, the authority to sign defendants' names to personal guarantees cannot be implied from its express provisions.

The agricultural management agreements conferred broad agency authority on SunCal, but from that alone one cannot imply the authority to bind defendants to a contract of guarantee. *Nicolai-Neppach Co. v. Abrams et al.,* 116 Or 424, 428, 240 P 870 (1925); *Williston on Contracts* 230, § 277a (3d ed 1959). First Interstate contends that, because SunCal had express power under the agricultural management agreements to arrange loans and credit, borrow money and "sign or endorse any documents" on defendants' behalf, it also had the power to sign personal guarantees for defendants if the money

was borrowed by SunOre. The authority to bind defendants for the repayment of loans taken by SunOre is not incidental to the authority to borrow money for defendants individually. We look to the extrinsic evidence to determine whether SunCal's authority to sign defendants' names to documents executed to obtain loans included the authority to sign defendants' names to guarantees of loans to third parties for use in a business in which defendants had a financial interest.

At the time when the management agreements were executed, a loan proposal under consideration by the bank for the farming of Sabre Farm contemplated individual loans to each investor. Each investor, including defendants, was to be personally responsible for his own loan. The management agreements were executed with that plan in mind. The bank rejected the idea as inconvenient and suggested that it make a master loan to SunOre. In order to retain certain tax advantages, defendants Bergendahl and Craig, and five other investors, became SunOre's limited partners. Because they were no longer borrowing money individually, in order to receive the desired tax benefits they had to assume certain risks for the repayment of SunOre's loans. They did that by way of the partnership provision establishing their personal liability to the partnership for up to three times their capital investments.[10]

Because the management agreements were executed when the parties contemplated individual loans to each investor, we conclude that there is no evidence that defendants intended that SunCal's authority to sign documents to obtain loans include the authority to sign defendants' names to documents necessary for SunOre to obtain loans. We conclude further that there is no evidence that defendants intended that the provisions of the management agreements authorizing SunCal to sign documents necessary to obtain loans for them would carry over to the partnership agreement, which does not authorize the signing of financial documents on defendants' behalf, and thereby authorize SunCal to sign defendants' guarantees of loans to SunOre.

There is evidence that, after inquiring, Jones was told

---

[10] The guarantees are redundant of the provision governing the limited partners' liability. See n 8, *supra*. At least theoretically, they duplicate (and double) defendants' potential liability.

by Behrens, president of SunCal, that he should sign the guarantees for defendants. There is no evidence, however, that Jones could reasonably regard Behrens as one who was authorized to grant him that authority if the management agreement did not give it to SunCal. Behrens, as well as Jones, served in many capacities.[11] The two never discussed with each other or with defendants whether defendants had authorized SunCal to obligate them on guarantees of loans to SunOre. If the authority did not exist, Behrens could not give it to Jones.

■ Neither the management agreements nor the partnership agreement actually authorized Jones or anyone else to sign defendants' names to guarantees of loans to SunOre. The only provision in any of the documents from which First Interstate might reasonably argue that such authority was "apparent" was SunCal's authority to sign documents on behalf of defendants to obtain loans. In view of the management agreements' express restriction on SunCal's authority to borrow, the bank was on notice that that authority was limited, and it cannot rely on a theory of apparent authority to support its claim. *See Bank of Oregon v. Hiway Products, Inc.,* 41 Or App 223, 227, 598 P2d 318 (1979).

The trial court found that Bergendahl and Craig, through their agent Mallen, learned that Jones had signed the guarantees and that, by failing to object timely, all three defendants had ratified Jones' act, if it was unauthorized. We are bound by those findings if there is evidence to support them. *Illingworth v. Bushong,* 297 Or 675, 694, 688 P2d 379 (1984). Although there is no direct evidence that Mallen knew of the guarantees, the record shows that Mallen knew of the negotiations concerning the guarantees, knew that the bank had sent a letter to SunOre conditioning final approval of the loan on the guarantees of Bergendahl and Craig[12] and also knew that the loan had closed. From that evidence, the court

---

[11] Behrens and Jones were "tax shelter managers" and were among the original promoters of the Sabre Farm enterprise. They contacted Mallen to encourage Bergendahl and Craig to invest in Sabre Farm. Behrens and Jones also prepared the management agreements, and there is evidence that Jones prepared the partnership agreement. Behrens and Jones, along with Bergendahl and Craig, were shareholders of SunCal and were also directors of that corporation. Behrens and Jones were directors of SunOre; Jones was its treasurer.

[12] The letter did not mention a guarantee by B.C. Farming.

could infer that Mallen knew that the guarantees had been signed for Bergendahl and Craig.

■          However, the same does not hold true with respect to B.C. Farming. First Interstate did not condition the loan on a guarantee by B.C. Farming. Jones provided it gratuitously. There was no reason for Mallen to suspect that a guarantee would be required from B.C. Farming and no evidence from which it can be inferred that he knew that Jones had signed such a guarantee. Without Mallen's or defendants' knowledge there can be no ratification. *Minniti v. Cascade Employers Assn,* 280 Or 319, 570 P2d 1171 (1977). B.C. Farming is not bound by the guarantee signed on its behalf without its authorization or ratification.

We consider the remaining assignments with respect to defendants Bergendahl and Craig only. The trial court found that Mallen ratified the guarantees for defendants Bergendahl and Craig when, after he acquired knowledge of them, he failed to repudiate them. *Restatement (Second) Agency* § 94 (1958). Mallen's knowledge is attributable to defendants. *State Farm Fire v. Sevier,* 272 Or 278, 537 P2d 88 (1975). In view of the trial court's finding that Mallen, within the scope of his authority, learned that the guarantees had been signed, Mallen had constructive knowledge of their material terms, including the facts that they were "continuing" and that they permitted attorney fees to be awarded to the party prevailing in an action on them. His silence is evidence from which ratification may be inferred.

On July 3, 1980, the bank made an additional loan commitment of over $5,000,000 to cover the partnership's extension of its farm operations to the Three Wells Farm and to cover a shift in the crops at Sabre Farm and Three Wells Farm from wheat to beans. The trial court found that there was insufficient evidence that defendants had guaranteed or ratified the guarantee of that portion of the additional loan which was intended for the farming of Three Wells Farm. It held, however, that the additional loan did not discharge defendants from their guarantees on the original loan for the operation of Sabre Farm.

■          Defendants' tenth through thirteenth assignments of error assert that the trial court erred in concluding that they were not discharged from the guarantees by First Interstate's

extension of additional credit after the initial loan. Defendants claim that, in lending additional money, the bank materially altered their risk without their consent. If that were the case, defendants would be discharged. *Equitable Savings & Loan v. Jones,* 268 Or 487, 491, 522 P2d 217 (1974). The trial court found, however, that the bank could reasonably have believed that the loan of the additional money for the shift to beans was necessary to reduce the risk of default. There is evidence to support that finding. The wheat crop was infested, and SunOre had a favorable bean contract. It needed the additional money to pursue the bean crop. There is also evidence that Mallen knew of the shift to a bean crop and knew of the additional loan for the farming of Sabre Farm. The trial court could and did find, on the basis of this evidence, that there was no increased risk of their default and that, in any event, Bergendahl and Craig, because of their knowledge of the additional loan, authorized or ratified it.

■        In their fourteenth assignment, defendants claim that their liability should be reduced because the bank honored improperly negotiated checks drawn on funds provided by the original bank loan. The court found that the bank had acted negligently in honoring those checks, which were signed by one signatory rather than the required two. It also found that the negligence did not affect the amount of Sabre's loss, which it found was caused by poor crop management. Those findings are supported by the record, and we agree that First Interstate's action in honoring the checks did not operate to reduce the amount of the loss against which defendants' guarantees apply. *Isaac v. American Heritage Bank,* 675 P2d 742 (Colo 1984).

Defendants assert in their fifteenth assignment that the court incorrectly increased their liability by 10 percent of the original loan amount. The trial court did not do that. It increased the amount to which the guarantees applied by 10 percent of the original loan amount. The 1979 Farm Plan and Budgets provided that each defendant agreed that his recourse liability "could vary up to 10 percent plus or minus, depending upon final crop budget." *See* n 6, *supra.* The trial court concluded that, by virtue of that provision, defendants had authorized the application of the guarantees to the original loan, plus up to 10 percent of the original loan amount. Even if the trial court's interpretation of the provision was wrong, we

do not see how it affected defendants' liability, which the court determined to be the amounts guaranteed. The outstanding balance on the loan to SunOre far exceeded the amounts guaranteed.

Defendants' remaining assignments of error are without merit.

Reversed as to B.C. Farming; otherwise affirmed.