Argued and submitted March 2, affirmed October 11, 2000

BEALL TRANSPORT EQUIPMENT CO.,
an Oregon corporation,
*Respondent,*

*v.*

SOUTHERN PACIFIC TRANSPORTATION,
a Delaware corporation;
Union Pacific Railroad Company,
a Utah corporation;
City of Portland; State of Oregon,
acting by and through the Department of Motor Vehicles;
John Hren; John R. Greisen; Thomas Morrison;
W. Raymond Horn; Stuart Abrams;
Wayne C. Klepper and Stuart Abrams,
dba Abrams Metals, Inc.,
*Defendants,*

*and*

ABRAMS, INC.,
dba Abrams Scrap Metals, Inc.,
*Appellant.*

SOUTHERN PACIFIC TRANSPORTATION COMPANY,
a Delaware corporation,
and Union Pacific Railroad Company,
a Utah corporation,
*Respondents,*

*v.*

Wayne C. KLEPPER
*Third-Party Defendant,*

*and*

Stuart ABRAMS,
*Appellant.*

(9701-00347; CA A102619)

13 P3d 130

Thomas M. Christ argued the cause for appellants Abrams, Inc., and Stuart Abrams. With him on the briefs was Michael H. Bloom.

Patrick L. Block argued the cause for respondent Beall Transport Equipment Co. With him on the brief were Steven G. Marks and Buono Block PC.

Christopher T. Carson argued the cause for respondents Southern Pacific Transportation Company and Union Pacific Railroad Company. On the brief were Gregory B. Snook, Jeffrey A. Kilmer, and Kilmer, Voorhes & Laurick, P.C.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

HASELTON, J.

**HASELTON, J.**

These consolidated civil cases arise from the theft of approximately 130 semi-trailers from the Southern Pacific Transportation Company's Brooklyn (eastside Portland) rail yard. Stuart Abrams and Abrams, Inc. (collectively, Abrams), who purchased the trailers from the thief, appeal from judgments (1) in favor of Southern Pacific on its conversion claim against Abrams, and (2) in favor of Beall Transport Equipment Co. (Beall), to whom Abrams sold many of the trailers, on its claim against Abrams for breach of contract. Abrams raises six assignments of error, contending, *inter alia*, that the trial court erred in striking Abrams's negligence defense to Southern Pacific's conversion claim and in refusing to give Abrams's requested jury instruction on conversion. We affirm.

The following facts are undisputed. Wayne Klepper was the manager of Southern Pacific's Brooklyn Yard in southeast Portland. On any given day, the yard was filled with several hundred semi-trailers, which Southern Pacific used to transport goods by both highway and rail. The trailers were hauled to the Brooklyn Yard by trucks, stacked on flatbed or specially designed rail cars and transported to other rail yards, where they were again attached to trucks and hauled to their final destinations. Use of such trailers for "intermodal" transport operations is common, and a trailer that is used by one railroad one day may be used by another the next day.

Trailers are generally not owned by the railroads that use them. Rather, they are owned by leasing companies that charge daily fees for use of their trailers. An elaborate interchange keeps track of which railroad has which trailers on which days, and each railroad is billed accordingly. Occasionally, a trailer is damaged during use. If the cost of repairing a trailer is greater than its depreciated value, the leasing companies often elect to sell the damaged trailer to a railroad for its depreciated value. The railroad is then free to sell the damaged trailer for scrap or other use, including use as a stationary storage container.

In May 1995, Klepper, falsely purporting to act on behalf of Southern Pacific as the Brooklyn Yard manager, sold several trailers to Abrams, a Portland scrap metal dealer. Klepper told Abrams that the trailers were excess trailers *owned* by Southern Pacific but, in fact, they were only *leased* by Southern Pacific. By the end of 1996, Klepper had sold Abrams about 130 such trailers from the Brooklyn Yard. Abrams, in turn, sold at least 79 of the stolen trailers to Beall, a used trailer dealer, who then resold 55 of the trailers to third parties. Klepper kept all of the proceeds from each sale for himself. He later pleaded guilty to criminal charges arising from these transactions.

When Southern Pacific finally learned that the trailers were missing, it immediately reported them stolen. With the aid of the police, Southern Pacific was able to recover many of the trailers from both Abrams and Beall.

Those circumstances led to the filing of the two consolidated cases now before us. First, in Multnomah County Case No. 9701-00347, Beall filed a complaint against, *inter alia*, Southern Pacific and Abrams,[1] for conversion, breach of contract, breach of warranty, and fraud. Southern Pacific responded with a cross-claim against Abrams for conversion, and Abrams cross-claimed against Southern Pacific for conversion and indemnity. Second, in Multnomah County Case No. 9701-00757, Abrams initiated a separate action against Southern Pacific, alleging, among other things, breach of contract and conversion. Southern Pacific counter-claimed, again alleging conversion. In both cases, Abrams's theory of recovery was that Southern Pacific was required to indemnify him for whatever he might owe Beall, because Klepper had "apparent authority" to sell him the trailers. Because the two lawsuits presented overlapping claims, they were consolidated for discovery and trial.

Before trial, the court granted partial summary judgment against Abrams on Beall's breach of contract claim, reasoning that Abrams's failure to convey good title to the trailers was a breach as a matter of law. Thus, the only issues

---

[1] Beall also named as defendants Klepper, the City of Portland, the Oregon Department of Motor Vehicles, and various other individuals who are not parties to this appeal.

remaining on Beall's claims against Abrams were the damages portion of the breach of contract claim and the fraud claim. Thereafter, on the eve of trial, Beall and Southern Pacific entered into a settlement agreement to dismiss their claims against each another and to cooperate in prosecuting their remaining claims against Abrams. Under the agreement, Beall acknowledged that it owed $103,001.07 to Southern Pacific, but Southern Pacific agreed that it would seek to collect that amount only if Beall succeeded in recovering at least that much from Abrams. Thus, the only matters remaining for trial were (1) the amount of Beall's breach of contract damages, and Beall's fraud claim, against Abrams; and (2) Abrams's and Southern Pacific's claims against each other.

The jury returned two special verdicts, the first relating to Beall's claims against Abrams and the second relating to all claims between Southern Pacific and Abrams in both cases. In the first verdict, the jury found that Beall had suffered damages of $209,875.61 from Abrams's breach of contract but that Abrams did not commit fraud. In its second verdict, the jury found in favor of Southern Pacific, rendering a special interrogatory response that Klepper did not have "apparent authority to sell non-scrap trailers to Abrams, Inc." The jury further found that Southern Pacific was entitled to damages from both Abrams, Inc., and Stuart Abrams for conversion of the trailers. Thereafter, pursuant to a stipulation by the parties, the trial court conducted a bench trial and determined that Southern Pacific was entitled to recover damages of $211,334.55 from Abrams, Inc., and $314,316.25 from Stuart Abrams.[2] The trial court then entered judgments in both cases in accordance with the jury's verdicts and its own determination of damages.

On appeal from those judgments, Abrams raises six assignments of error. For clarity, we address each in the

---

[2] We are unable to discern, from the voluminous record, the exact basis for the $102,981.70 difference between the damages recovered from Abrams, Inc., and the damages recovered from Stuart Abrams, individually. It appears, however, that the difference can be attributed to the fact that Southern Pacific claimed damages for "per diem" charges against both Abrams, Inc., and Stuart Abrams, but claimed damages for the depreciated value of the trailers that were never recovered only from Stuart Abrams as an individual.

order in which it arose at trial, beginning with Abrams's fourth assignment, which asserts that the trial court erred in striking Abrams's "negligence defense" to Southern Pacific's conversion claims before trial.

In Southern Pacific's third-party claim against Abrams in the *Beall v. Southern Pacific* case (No. 9701-00347), Southern Pacific sought damages from Abrams for conversion of the trailers that Abrams purchased from Klepper. Likewise, in Southern Pacific's counterclaim against Abrams for conversion in the *Abrams v. Southern Pacific* case (No. 9701-00757), Southern Pacific sought damages for Abrams's alleged conversion of the trailers. In both cases, Abrams's response to Southern Pacific's conversion claim was that Southern Pacific was "prevented from recovering" because it had been "negligent" in allowing Klepper to dispose of the trailers.[3]

■ Before trial, Southern Pacific moved to strike Abrams's negligence defense to Southern Pacific's conversion claim, arguing that, as a matter of law, negligence is not a defense to conversion. After "reviewing the authorities and hearing arguments," the trial court granted Southern

---

[3] Specifically, Abrams asserted:

"Southern Pacific is prevented from recovering for any loss for conversion of semi-trailers because Southern Pacific was negligent in causing said conversion in the following particulars:

"1. In failing to adequately supervise [its] Portland Hub Manager, Wayne Klepper;

"2. In failing to adequately supervise [its] Regional Hub Manager, Pat Ryan;

"3. In failing to adequately monitor the trailer inventory at the Portland Brooklyn Yard;

"4. In failing to insure trailers were properly checked in and out of the Portland Brooklyn Yard;

"5. In failing to install adequate security measures to prevent trailer theft at the Portland Brooklyn Yard;

"6. In failing to investigate in a timely manner missing trailers at the Portland Brooklyn Yard;

"7. In failing to adequately monitor files of depreciated value trailers to determine the ultimate disposition of said trailers; and

"8. In allowing [its] Portland hub manager, Wayne Klepper, in charge of the day-to-day activities of Portland Brooklyn Yard, to make unauthorized sales of semi trailers for over eighteen months without discovering said unauthorized sales."

Pacific's motion. We review the trial court's order striking Abrams's negligence defense for legal error.

On appeal, Abrams asserts, and Southern Pacific and Beall dispute, that negligence is a defense to conversion under Oregon law. We note, and emphasize, at the outset, that the parties did not argue to the trial court, or on appeal, that the availability of such a defense in these circumstances is to be determined by reference to the Uniform Commercial Code. The parties advance no arguments that UCC provisions have displaced any common-law defenses to conversion, and we specifically reserve that question. *See* ORS 71.1030 (unless displaced by the particular provisions of the UCC, the principles of law and equity shall supplement the UCC). In particular, Abrams did not invoke the "merchant entrustment" principle of ORS 72.4030(3) by contending that Klepper was a "merchant" within the meaning of the provision.[4] *Accord Thorn v. Adams*, 125 Or App 257, 262 n 3, 865 P2d 417 (1993) (applying UCC entrustment provisions).[5] Rather, the parties frame this dispute exclusively in terms of the Oregon common law of conversion. At the core of that dispute is *Valley Motor Co. v. Ralls*, 224 Or 290, 355 P2d 1100 (1960).

In *Valley Motor*, the plaintiff, a car dealership, gave its salesmen permission to demonstrate cars as well as free access to the office in which it kept the endorsed blank certificates of title for all of its cars. *Id.* at 293. Donahoe, one of the

---

[1] ORS 72.4030 provides, in part:

"(1) A purchaser of goods acquires all title which the transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. * * *

"* * * * *

"(3) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the entruster to a buyer in ordinary course of business.

"(4) 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting of the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

[5] In *Thorn v. Adams*, we noted that *So. Seattle Auto Auction, Inc. v. Ladd*, 230 Or 350, 370 P2d 630 (1962), which is central to the present parties' arguments, *see* 170 Or App at 348-49, was rendered "inapposite" in the merchant entrustment context by the subsequent enactment of the UCC. *Thorn*, 125 Or App at 262 n 3.

plaintiff's salesmen, took a 1957 Lincoln and its certificate of title to the defendant, another car dealer. Donahoe told the defendant that Valley Motor had authorized him to "shop" the Lincoln around to other dealers to get the best cash sale price obtainable. The dealer agreed to purchase the car and, in accordance with accepted practice in the trade, gave Donahoe a check made payable to Donahoe himself in exchange for the car and certificate of title. Donahoe promptly absconded with the proceeds from the sale. Valley Motor sued the defendant for conversion, but the trial court held that Valley Motor was estopped from asserting its title against the defendant. Valley Motor appealed, and the Supreme Court affirmed.

In affirming, the court cited two earlier Oregon cases, *Plummer v. Kingsley*, 190 Or 378, 226 P2d 297 (1951), and *Richardson v. Bouthillier*, 193 Or 354, 238 P2d 212 (1951), for the proposition that "an owner who voluntarily places it within the power of a wrongdoer to defraud an innocent purchaser is denied the right to recover against the innocent purchaser." *Valley Motor*, 224 Or at 296. Valley Motor argued that that rule should not apply to it because Donahoe had taken the certificate of title without express permission and that, therefore, Valley Motor had not "voluntarily" placed it within Donahoe's power to defraud the defendant. *Id.* at 297. Valley Motor distinguished *Plummer* on the basis that, in *Plummer*, the plaintiffs had *voluntarily* given ownership papers to the wrongdoers. The court rejected Valley Motor's invitation to "distinguish the two cases on the degree of negligence involved," *id.*, and "adopt[ed] the rule" that Valley Motor's conduct of "continu[ing] after notice to employ untrustworthy help and * * * leave[ing] indorsed certificates of title within easy reach of such persons" was "voluntary conduct" that estopped Valley Motor from asserting title against the defendant. *Id.* at 299.

Abrams argues that, in light of *Valley Motor*, the trial court erred in striking his "negligence" defense. As a threshold matter, Southern Pacific correctly points out that *Valley Motor* and the cases on which it was based apply an "estoppel" defense to conversion, not a "negligence" defense. Although the *Valley Motor* court did use the term "negligence" to refer to the type of voluntary conduct that might

estop an owner from asserting his or her title against an innocent purchaser,[6] the court's rule was explicit: "[W]e adopt the rule that one who * * * leaves indorsed certificates of title within easy reach of such persons has by his voluntary conduct *estopped* himself to assert title against an innocent purchaser." 224 Or at 299. Abrams's arguments attempting to characterize the holding in *Valley Motor* as a recognition of "negligence" as a defense to conversion are not well taken. Accordingly, we refer to the defense in question as one of estoppel, not negligence.

■      With that difference in terminology settled, we return to the parties' substantive arguments concerning the availability of the *Valley Motor* estoppel defense to Abrams. Southern Pacific and Beall contend that the trial court correctly understood *Valley Motor* to estop an owner of property from asserting a conversion claim *only* if he or she delivered *both* possession of the property *and* the certificate of title or some other "indicia of ownership" to a person who, in turn, sold it to the alleged converter. Southern Pacific argues that here, the trial court did not err in striking Abrams's estoppel defense because nothing in the record suggests that it gave Klepper any "indicia of ownership."

Abrams responds that "nothing in the *Valley Motor* opinion suggests that the court intended to confine its ruling to those exact facts." According to Abrams, the estoppel defense is *not* limited to situations in which the owner gave the converter access to "indicia of ownership." Abrams asserts that he was entitled to the estoppel defense because "the Railroad's alleged carelessness in allowing Klepper to dispose of the trailers precludes the Railroad from proceeding against Abrams on a conversion theory," even though nothing in the record suggests that Southern Pacific gave Klepper access to any ownership documents for the trailers. For the reasons that follow, we agree with Southern Pacific.

---

[6] The court in *Valley Motor* discussed the application of a similar estoppel defense in the context of stock certificates. It recited the rule that "[i]n order to cut off the rights of the owner * * * there must be sufficient *negligence* or voluntary conduct on the owner's part to constitute an estoppel" and noted that "the bearer of an indorsed stock certificate * * * can cut off equities of an owner whose only *negligence* was in failing to safeguard the indorsed paper." 224 Or at 298 (emphasis added).

The Oregon Supreme Court first recognized estoppel as a defense to conversion in *Plummer*. 190 Or at 378. There, the owner of an automobile gave both possession and certificate of title to a wrongdoer in exchange for what later turned out to be a bad check. The thief turned around and sold the car to an innocent purchaser. The original owner sued the innocent purchaser for conversion, and the purchaser claimed title by estoppel. The trial court rejected the purchaser's estoppel defense, and the Supreme Court reversed. The court examined several treatises, as well as statutes from other jurisdictions, and gave the following summary of its conclusions:

> "(1) The fact that an owner has *merely entrusted someone with possession and control* of a chattel *is not sufficient to estop him* from asserting title against one who has purchased from the possessor in reliance on the apparent ownership of the possessor. * * * (2) * * * [W]hen an owner voluntarily clothes the fraudulent or criminal purchaser with *indicia of title and* delivers to him the *possession* of the chattel, he will be estopped to assert his title as against one who for value and in good faith and without notice, purchases the chattel in reliance upon the apparent ownership of the one so entrusted with possession and indicia of title." 190 Or at 390-91 (emphasis added; citations omitted).

Thus, the court's decision that the owner was estopped from asserting his title against the innocent purchaser turned on the fact that the owner had "voluntarily clothed" the wrongdoer with *both* "indicia of title" *and* "possession and control" of the car. *Id.*

Since *Plummer*, the Supreme Court has considered the availability of estoppel as a defense to conversion in *Richardson, Valley Motor*, and *So. Seattle Auto Auction, Inc. v. Ladd*, 230 Or 350, 370 P2d 630 (1962). Both *Richardson* and *Valley Motor* applied estoppel as a defense to conversion where, as in *Plummer*, the original owner had given the wrongdoer access to both possession of the car and some "indicia of ownership."[7] It was not until *So. Seattle* that the

---

[7] In *Richardson*, the original owner of a car gave a wrongdoer possession of the car and a copy of the conditional sales agreement, in exchange for a bank draft for the down payment. 193 Or at 354-58. The wrongdoer sold the car to an innocent purchaser, and the owner sued the purchaser for conversion. On review, the

court was squarely presented with the issue of whether an owner's act of giving a wrongdoer *possession* of a car, without any other indicia of title or ownership, is conduct giving rise to an estoppel defense in the innocent purchaser.[8]

In *So. Seattle*, the plaintiff, who operated an auto auction, entered into an arrangement with Anderson, a mechanic, under which Anderson was to buy used cars in Oregon, clean and repair them, and then transport them for sale at the plaintiff's auction in Seattle. 230 Or at 353-57. Because Anderson did not have sufficient funds to buy the cars, the plaintiff agreed that Anderson would draw a draft on the plaintiff and deliver it to the selling dealer, who would present the draft to the plaintiff for payment, accompanied by the certificate of title. Anderson would receive any profit made on the sale of the cars at auction, less a $25 auction fee. The parties handled the sale of about 200 cars in this manner, but on the occasion in question, Anderson deviated from the arrangement. He purchased two cars using drafts from the plaintiff, who honored them and received the certificates of title from the sellers. However, instead of repairing the cars and delivering them to the plaintiff for the auction, Anderson sold them to the defendant, another car dealer. Anderson delivered possession and a bill of sale for each of the cars to the defendant in exchange for cash, which Anderson kept for himself. The plaintiff, who still had the certificates of title for the cars, brought a successful replevin action against the defendant. The defendant then appealed, arguing that the plaintiff was estopped from asserting its title because it had created a deceptive situation on which the defendant had relied. *Id.*

On appeal, the court concluded that the defendant was not entitled to claim estoppel. *Id.* at 368. Citing *Richardson* and *Plummer*, the court noted that all other Oregon cases

---

Supreme Court held that the owner was estopped from asserting title against the innocent purchaser, reasoning that "although [the wrongdoer] had not received a complete title as in the *Plummer* case, he nevertheless had been vested with *tangible indicia of a valuable interest* in the thing purchased and in a form that showed his valuable interest was a marketable item." *Id.* at 362 (emphasis added).

[8] As noted, 170 Or App at 343 n 5, the subsequent enactment of the UCC rendered *So. Seattle* "inapposite" in circumstances subject to the "merchant entrustment" provisions of ORS 72.4030. Abrams has never contended that the transactions here fall within that provision.

applying estoppel in similar contexts were cases in which "the owner had entrusted the certificate of title or some other evidence of ownership than the mere possession of the car to the wrongdoer." *Id.* at 365. The court cited *Plummer* for the proposition that:

> "[M]erely entrusting another with the possession or control of property is not sufficient to estop the true owner from asserting title against one who has purchased from the possessor in reliance upon the latter's apparent ownership." *Id.* at 362.

Based on that rule, the court concluded that, because Anderson had only "naked possession" of the cars and not the certificates of title or other indicia of ownership, the defendant was not entitled to assert estoppel as a defense. *Id.* at 368.

■    We thus understand *South Seattle* to confirm the principle at least implicit in *Richardson, Plummer,* and *Valley Motor*: A third-party purchaser can successfully assert estoppel as a defense to conversion only if the plaintiff/owner gave the thief access to some indicia of ownership above and beyond mere possession, thereby creating an appearance of ownership on which the defendant/purchaser relied.[9] That rule controls here. Klepper, as the Brooklyn Yard manager, had control and, in a sense, possession of the trailers that he sold to Abrams. The parties agree, however, that Southern Pacific never gave Klepper access to any "indicia of ownership," *i.e.*, certificates of title, beyond his mere control of the trailers. Under *South Seattle*, the fact that Southern Pacific "merely entrust[ed] [Klepper] with the possession or control of [the trailers] is not sufficient to estop [the Southern Pacific] from asserting title against one who has purchased from the possessor in reliance upon the latter's apparent ownership

---

[9] *Whitlock v. Hogrefe*, 278 Or 739, 565 P2d 1092 (1977) corroborates our understanding of *So. Seattle*. There, the defendant argued on appeal that he was entitled to assert estoppel as a defense to conversion. The court rejected that argument:

> "*So. Seattle Auto Auction, Inc. v. Ladd*, which reviews other cases on unauthorized sales of automobiles, distinguished situations where an owner has given the misappropriating seller documents implying his ownership from others in which he is merely in possession, and that decision actually held against a claim of estoppel. The plaintiff estate in the present case did not give Ralph Hogrefe any similar evidence of ownership of the logs he converted, beyond the mere authority to fall, prepare, and deliver them to the correct purchaser." 278 Or at 744.

[Abrams]." *So. Seattle*, 230 Or at 362. Accordingly, the trial court did not err in striking Abrams's estoppel defense.

■ We next turn briefly to Abrams's first assignment of error, challenging the trial court's denial of Abrams's motion for a mistrial following *ex parte* mid-trial interactions unrelated to the case between Beall's attorney and two members of the jury. "[B]ecause the trial court is in the best position to evaluate the effect upon the jury of claimed misconduct * * *, we consider the granting or denial of such a motion for mistrial to be a matter which should be left largely to the discretion of the trial judge, subject to reversal only for an abuse of that discretion." *Plourd v. Southern Pacific Transportation Co.*, 272 Or 35, 44, 534 P2d 965 (1975). Here, it would not benefit the bench or bar to describe in detail the exact nature of the *ex parte* contact between Beall's attorney and two members of the jury. We have reviewed the record, which was adequately developed on this matter, and conclude that, under the standard applied in cases involving *ex parte* contact between a party and a juror, the trial court did not abuse its discretion in denying Abrams's motion for a mistrial. *See, e.g., Johnson v. Kolovos*, 224 Or 266, 274-75, 355 P2d 1115 (1960) (no abuse of discretion in denying motion for mistrial after the plaintiff and a juror had a conversation unrelated to the case during recess); *Tucker v. Salem Flouring Mills Co.*, 13 Or 28, 34, 7 P 53 (1885) (no abuse of discretion in denying motion for mistrial after the plaintiff had a conversation about the case in the presence of a juror).

■ Abrams's fifth assignment of error, which asserts that the trial court erred in granting Southern Pacific's motion to strike Abrams's allegations that Klepper had "implied" authority to sell the trailers, also requires only a brief discussion.

■ ■ "Actual authority" is authority that a principal intends to confer upon an agent; as such, it may be either "express" or "implied." *See Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 23-25, 803 P2d 1178 (1991). "Express" authority is authority that the principal confers upon the agent in express terms, while "implied" authority is that which is "reasonably incident to the expressly authorized transactions and necessary to accomplish the objectives of

the agency." *First Interstate Bank v. Bergendahl*, 80 Or App 479, 485, 723 P2d 1005, *rev den* 302 Or 299 (1986). Abrams contends that, even though Klepper did not have "express" authority to sell the trailers, there was evidence from which the jury could conclude that Klepper had "implied" authority to sell the trailers. Specifically, Abrams argues that, because Klepper was "in charge of all operations in the Brooklyn Yard, * * * the jurors could reasonably infer that this grant of general authority to Klepper reasonably included the specific authority to sell any equipment, including trailers, that he deemed necessary for yard operations." We disagree.

Nothing in this record supports Abrams's claim that Klepper's general duties as yard manager gave him "implied authority" to sell trailers that Southern Pacific did not own. Southern Pacific's regional hub manager testified that Klepper was not authorized to sell any property, even if it belonged to Southern Pacific, except "in isolated sales of small amounts of scrap." Klepper did have limited authority to arrange for the sale of "scrap" trailers, but those transactions went through Southern Pacific's San Francisco office, which handled all aspects of payment and transfer of title. There is no evidence in the record to suggest that any of Klepper's expressly authorized duties carried with them the incidental, or "implied," authority to sell operable trailers that Southern Pacific leased but did not own. Abrams's arguments to the contrary are unavailing. Accordingly, the trial court did not err in striking Abrams's "implied authority" claim.

■    Abrams's third assignment of error, relating to the trial court's refusal to give one of Abrams's requested jury instructions, requires more discussion.

Abrams requested the following jury instruction, which is taken verbatim from section 222A of the *Restatement (Second) of Torts* (1975):

> "Conversion is an intentional exercise of dominion or control over personal property which so seriously interferes with the right of another to control it that the actor may be justly required to pay the full value of the personal property.

"In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:

"(a)   The extent and duration of the actor's exercise of dominion or control;

"(b)   The actor's intent to assert a right in fact inconsistent with the other's right of control;

"(c)   The actor's good faith;

"(d)   The extent and duration of the resulting interference with the other's right of control;

"(e)   The harm done to the chattel;

"(f)   The inconvenience and expense caused to the other."

In contrast, Southern Pacific submitted a requested instruction limited to *only* the first paragraph of section 222A, which defines the tort of conversion. The trial court ultimately gave Southern Pacific's requested instruction, and Abrams did not make any exception.[10]

Abrams contends that the trial court's failure to give his requested conversion instruction is reversible error because it is an accurate statement of the law and failure to instruct the jury on the factors it should consider in determining whether Abrams was liable for conversion may have affected the jury's deliberations.[11] Southern Pacific responds, *inter alia*, that Abrams is foreclosed from making that argument because he failed to preserve it. Because we agree with Southern Pacific that Abrams's assignment of error is not preserved, we do not reach the parties' substantive arguments.

ORCP 59 H provides the general rule for preserving challenges to both a trial court's giving of instructions and to the failure to give requested instructions:

---

[10] Abrams does not separately assign error to the instruction the court did give.

[11] Failure to give a requested instruction to the jury is reversible error only if the requested instruction "correctly expressed the law and * * * failure to submit [the instruction] may have affected the jury's deliberations." *State Farm Fire and Casualty Co. v. Green*, 139 Or App 51, 56, 911 P2d 357, *rev den* 323 Or 691 (1996).

"No statement of issues submitted to the jury pursuant to subsection C(2) and no instruction given to a jury shall be subject to review upon appeal unless its error, if any, was pointed out the judge who gave it and unless a notation of an exception is made immediately after the court instructs the jury. Any point of exception shall be particularly stated and taken down by the reporter or delivered in writing to the judge. It shall be unnecessary to note an exception in court to any other ruling made. *All adverse rulings, including failure to give a requested instruction* or a requested statement of issues, except those contained in instructions and statements of issues given *shall import an exception in favor of the party against whom the ruling was made.*" (Emphasis added.)

Thus, the *general* rule is that a litigant must preserve his or her ability to challenge a *given* instruction by excepting to it immediately, but need not except to *failure* to give a requested instruction, because the trial court's refusal to give the requested instruction "import[s] an exception." ORCP 59 H.

■ There is, however, a narrow exception to the general rule that no exception need be taken to preserve a challenge to a failure to give a jury instruction. *See ODOT v. Winters*, 170 Or App 118, 10 P3d 961 (2000); *Thompson v. Inskeep*, 95 Or App 688, 770 P2d 953 (1989). This case falls within that exception.

In *Thompson*, the plaintiff, in a personal injury action arising from an auto collision, requested that the court give the uniform civil jury instruction on comparative negligence. That uniform instruction, UCJI 11.51,[12] stated:

"Plaintiff and defendant have each alleged that the [injury] [damage] [collision] was caused by the other's negligence. This requires instructing you on the law of comparative negligence. If you find that both defendant and plaintiff were negligent in any respect alleged which was a cause of the damage complained of, then you should compare the negligence of plaintiff to the negligence of defendant.

---

[12] UCJI 11.51 has since been renumbered as UCJI 21.02, but otherwise remains unchanged.

*"In making this comparison, you are to measure the negligence of the parties and not the mere physical causation of the [injury] [damage] [collision].*

"If plaintiff's negligence was greater than defendant's negligence, then plaintiff is not entitled to a verdict in [his] [her] favor. However, if plaintiff's negligence was equal to or less than defendant's negligence, then plaintiff is entitled to a verdict in plaintiff's favor.

"In other words, if plaintiff's negligence was more than 50%, then plaintiff is not entitled to a verdict in plaintiff's favor. On the other hand, if plaintiff's negligence is 50% or less, than [he] [she] is entitled to a verdict in [his] [her] favor. Do not reduce the amount of plaintiff's damages, if any. The judge will reduce the amount awarded to the plaintiff by the percentage of plaintiff's negligence, if any." *Thompson*, 95 Or App at 690 n 2 (emphasis in original).

The trial court's instruction to the jury on comparative negligence incorporated all aspects of the uniform instruction except the second, italicized paragraph. *Id.* at 691-92. The plaintiff did not except to the given instruction.

On appeal, the plaintiff assigned error to the trial court's failure to give his requested instruction, arguing that the requested instruction was a correct statement of the law and that the portion of the instruction that was not given was fundamental to his theory of the case. *Id.* at 690. The defendant responded that the plaintiff had "waived" any error in the trial court's failure to give his requested instruction by not excepting to the comparative negligence instruction that the trial court ultimately gave. Specifically, the defendant contended that the trial court was not made aware of the distinction between the requested instructions and the given instructions, because the requested and given instructions were not contrary and "differ[ed], if at all, in clarity, not substance." We agreed:

"The dispositive issue is whether plaintiff was required to take an exception to preserve the alleged error. ORCP 59 H provides, in part, that no exception is necessary if *no* instruction is given on the subject of the requested instruction.

"* * * * *

"It is immaterial that that [given] instruction explained the verdict form as well as comparative negligence. It was nonetheless an instruction on comparative negligence within the meaning of ORCP 59 H. The commentary to ORCP 59 H provides, in part:

" 'Section 59H is based on ORS 17.505 through 17.515 * * *. On the question of whether failure to give a requested instruction preserves error in instructions given, *see Holland v. Sisters of Saint Joseph*, 270 Or 129, 522 P2d 208, 526 P2d 577 (1974), and *Becker v. Beaverton School District*, 25 Or App 879, 551 P2d 498 (1976).' *Reprinted in* Merrill, *Oregon Rules of Civil Procedure: 1988 Handbook* at 184.

"In *Holland*, the Supreme Court held that there must be something in a proposed instruction that 'clearly and directly' calls the trial court's attention to the error in the instruction given. 270 Or at 141, 522 P2d 208. Relying in part on *Holland, Roberts v. Mitchell Bros.*, 289 Or 119, 131, 611 P2d 297 (1980), held that no exception is required if the proposed instruction is 'clearly and directly' contrary to an instruction that the court gives, thereby calling the trial court's attention to the alleged error. Although *Roberts* and *Holland* were decided under former ORS 17.510, the adoption of ORCP 59 H did not undercut their holdings.

"* * *Paragraph two of the requested instruction * * * did not 'clearly and directly' alert the trial court to the purported error of which plaintiff complains. Accordingly, an express exception that told the court how the two instructions differed and why the court's [instruction] was wrong was required to preserve the error." *Id.* at 693 (emphasis in original).[13]

We have since discussed the narrow exception illustrated by *Thompson* on three brief occasions. In *Butler v. Dept. of Corrections*, 138 Or App 190, 197, 909 P2d 163 (1995), where the defendant's requested instruction included

---

[13] In *Roberts*, which we cited in *Thompson*, the court held that the appellant need not have explicitly excepted to the instruction given in order to preserve an objection to a failure to give a requested instruction. 289 Or at 131. In rejecting the plaintiff's argument that the defendant had "waived its right to assign * * * error" to the *failure* to give its instruction by failing to except to the *given* instructions, the court emphasized that the requested instruction "clearly and directly" alerted the trial court to the error in the given instruction because the requested and the given instruction were mutually exclusive. *Id.* at 128, 131.

an element of a tort that the given instruction erroneously omitted, we held that the defendant's assignment of error to the trial court's failure to give his instruction was preserved because it had "clearly and directly" called the court's attention to the difference between the given and requested instructions. Conversely, in *Elliott v. Tektronix*, 102 Or App 388, 394, 796 P2d 361, *rev den* 311 Or 13 (1990), where the plaintiff assigned error to the trial court's failure to give her requested jury instruction, we held that the plaintiff failed to preserve the error because "she failed to take an exception to the functionally equivalent instruction that was given."

Finally, in *Winters*, 170 Or App at 125-26, we concluded, citing *Thompson*, that the defendant-appellant failed to preserve the alleged error in the court's failure to give the defendant's requested instruction on the elements of inverse condemnation:

> "It is true that ORCP 59 H provides that the failure to give a requested instruction 'imports an exception in favor of the party against whom the ruling was made.' However, that portion of the rule only applies if *no* instruction at all is given on the subject of the requested instruction. When another instruction on the subject is given, an express objection is required to preserve error, unless the proposed instruction is 'clearly and directly' contrary to the given instruction, thereby calling attention to the alleged error.

> "Defendant's proposed instructions were not so clearly and directly contrary to the instructions given by the court that they called attention to the error claimed on appeal. The trial court's instruction described the elements of inverse condemnation in the context of a temporary taking, *although not in the same detail and format as defendant's proposed instruction*. In addition, defendant's general objection simply was not sufficient to explain why the court's instructions were wrong. Accordingly, we conclude that defendant has failed to preserve his argument concerning the court's failure to give his proposed instructions." (Emphasis added.)

Relying on *Thompson*, Southern Pacific argues that Abrams's assignment of error to the trial court's failure to give his conversion instruction is not preserved because Abrams did not except to the conversion instruction given.

Specifically, Southern Pacific contends that Abrams's requested conversion instruction and the conversion instruction given were "identical in effect," and therefore did not "clearly and directly" call the trial court's attention to the difference between the two.

Abrams responds that "no exception was needed to preserve" error in the trial court's failure to give his requested instruction because, as distinguished from *Thompson*, the trial court knew that there was a difference between the two instructions and chose to give only the first paragraph. Abrams asserts that the second paragraph of section 222A—the portion of his requested instruction that was not given to the jury "is not just so much spilled ink." Rather, he argues, the factors identified as relevant to the jury's consideration of Abrams's liability for conversion in the second paragraph of section 222A were an "all-important" explanation of the law. According to Abrams, his requested instruction "clearly and directly" alerted the trial court to the error in the given instruction. We disagree.

We note, at the outset, that this is not a case, like *Butler* or *Roberts*, of "mutually exclusive" instructions. Nothing in the court's instruction contradicted anything in plaintiff's requested instruction. Rather, as in *Thompson*, the court's instruction and the requested instruction were identical, except the latter included additional material amplifying or guiding the jury's consideration of the essential elements set out in the common language of both instructions. Thus, just as the deleted paragraph of UCJI 11.51 in *Thompson* described factors the jury was to consider in assessing comparative fault, so too the deleted paragraph from *Restatement* section 222A in Abrams's requested instruction identified factors bearing on the jury's consideration of certain elements of conversion.

In sum, although the difference between the court's instruction and the requested instruction in this case may have been quantitatively greater than in *Thompson*, the *qualitative* difference is the same. Consequently, just as the defendant's requested instruction in *Thompson* did not "clearly and directly" alert the trial court as to "how the two instructions differed and why the court's was wrong"

*Thompson*, 95 Or App at 693, the same was true here. *See also Winters*, 170 Or App at 125-26. Because Abrams failed to except explicitly to either the court's conversion instruction or to the failure to give his requested instruction, his third assignment of error is not preserved.

■        Abrams's final two assignment of error require only brief discussion. In his second assignment of error, Abrams argues that the trial court erred in responding to the jury's written questions without notifying the parties. ORCP 59 D.[14] We have reviewed the record, and we agree with Southern Pacific and Beall that Abrams acquiesced in the alleged error by expressly agreeing to the trial court's exercise of discretion as to whether or not to call the attorneys before responding to questions from the jury.[15]

■        Finally, we consider, and reject, Abrams's sixth assignment of error. After the jury returned its verdict, and pursuant to the parties' stipulation, the trial court conducted a bench trial to determine Southern Pacific's damages. Southern Pacific sought damages for, *inter alia*, the "per diem" charges on the trailers from the time they were stolen to the time they were either recovered or written off for the depreciated value. After Southern Pacific put on its proof of those "per diem" damages, Abrams moved for a directed verdict on Southern Pacific's claim for recovery of the "per diem" damages. The trial court denied Abrams's motion.

On appeal, Abrams asserts that Southern Pacific was entitled to loss of use damages only if it demonstrated

---

[11] ORCP 59 D provides:

"After retirement for deliberation, if the jury requests information on any point of law, the judge may require the officer having them in charge to conduct them into court. Upon the jury being brought into court, the information requested, if given, shall be given either orally or in writing in the presence of, or after notice to, the parties or their counsel."

[15] Specifically, at the beginning of deliberations, the trial court indicated to counsel that, if the jury asked him an inappropriate question about the facts of the case, he would simply instruct jurors to "determine that based upon the evidence you have heard in the case," presumably without contacting the attorneys. The trial court went on to explain that he would, however, "try to get the attorneys together on the phone" if the jurors had a more complicated question. Southern Pacific's counsel then stated, "It is perfectly agreeable to us, your exercising your discretion whether to call us or not." Abrams's counsel agreed: "We don't have any objection to that."

actual losses incurred, *i.e.*, expenses incurred renting replacement trailers. In light of our case law to the contrary, that argument fails. *See, e.g., Graf v. Don Rasmussen*, 39 Or App 311, 317-18, 592 P2d 250, *rev den* 286 Or 521 (1979) ("The majority of jurisdictions hold that it is not necessary that plaintiff actually incur expense in acquiring a substitute in order to recover for loss of use * * *. The owner has suffered compensable inconvenience and deprivation of the right to possess and use her chattel whether or not a substitute was obtained."). The trial court did not err in denying Abrams's motion for directed verdict on Southern Pacific's claim for loss of use damages.

Affirmed.